## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) MICHAEL FRIEDMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 08-cv-936-M |
| v. | ) ) ) | JUDGE VICKI MILES-LaGRANGE |
| (1) QUEST ENERGY PARTNERS LP; (2) QUEST ENERGY GP LLC; (3) QUEST RESOURCE CORPORATION; (4) JERRY D.CASH; (5) DAVID E. GROSE; (6) DAVID C. LAWLER, (7) GARY PITTMAN; (8) MARK STANSBERRY; (9) MURRELL, HALL, McINTOSH & CO. PLLP; AND (10) EIDE BAILLY LLP, | ) ) ) ) ) ) ) ) ) ) | **CONSOLIDATED COMPLAINT OF QUEST ENERGY PARTNERS LP LEAD PLAINTIFF GROUP** <u>**JURY TRIAL DEMANDED**</u> |
| Defendants. | ) ) | |

_____

Lead Plaintiffs, Mark Barretti, Samuel Hyman, Leslie Sundquist, Billy Truit and Francis Biermeier (collectively "Lead Plaintiffs," "Plaintiffs" or the "Barretti Group"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys. Such investigation included, among other things, a review of the Defendants' public documents, conference calls and announcements made by

Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Quest Energy Partners LP ("QELP," "Quest Energy" or the "Company")[1] and its related entities, securities analysts' reports and advisories about the Company, pleadings and other documents, including all complaints or amended complaints, filed in SEC v. Jerry D. Cash and David E. Grose, Case No. Civ-09-639-L (W.D. Okla.) and Oklahoma Dept. of Securities v. Jerry D. Cash, No. CJ-2008-7963 (Dist. Ct. Okla. County) and information readily obtainable on the Internet.    Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

     **I.**      <u>**NATURE OF THE ACTION AND SUMMARY OF THE ALLEGATIONS**</u>

     1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the common units of Quest Energy Partners, LP during the period November 7, 2007 through August 24, 2008 (the "Class Period"), including persons or entities that purchased common units pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's Initial Public Offering (the "IPO").    The action seeks to recover damages caused by Defendants' violations of federal securities laws and to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

     2.     The case arises from the misappropriation of over $10 million of corporate assets from QELP by its Chief Executive Officer and Chairman, Jerry D. Cash ("Cash"),

---

[1] Although QELP is a partnership, it is referred to herein, at times, as the Company.

and its Chief Financial Officer, David E. Grose ("Grose"), and the remaining Board members' and the Company's auditors conscious disregard of Cash's and Grose's misconduct.  The Board consciously failed to implement an effective system of internal controls over, among other things, the Company's accounting, cash flow and financial reporting.  The auditors failed to stop the fraud despite numerous red flags that should have called it to their attention.

3.    Cash and Gross exploited the lack of controls at QELP to cause the Company to transfer millions of dollars to Cash and business entities controlled by Cash on a quarterly basis from 2004 to 2008. Starting with transfers of only a few hundred thousand dollars, the size of the transfers ballooned to $10 million per quarter.  With Grose's active assistance, monies were transferred from QELP bank accounts to a bank account of Rockport Energy LLC ("Rockport Energy"), an entity and bank account that Cash controlled, at the beginning, and during, each fiscal quarter.  Cash would then use the funds for his private personal and outside business endeavors.

4.    At the very end of each quarter, Cash would then pretend to repay funds he took from QELP via a check drawn on the bank account of Rockport Energy. However, because he had used the money in the intervening time, the bank account did not have sufficient funds to cover the checks written to QELP.  Therefore, Cash would time the "repayments" in such a way that QELP, in fact, would be funding them.  More specifically, Cash would write the "repayment" checks to QELP on the last day of the quarter, thus allowing QELP to recognize the funds as an asset in that quarter (and allowing Cash to pretend that he had "zeroed out" his debt to QELP).  Then, on the first business day of the next quarter – but before QELP cashed the "repayment" check —

Cash, assisted by Grose, would have QELP once again transfer enough funds to his bank account to ensure that the "repayment" checks cleared.

5.    The net effect of Cash's scheme was to deprive QELP of a large and increasing amount of cash, on a virtually permanent basis, as the money never returned to QELP's bank account for more than a day or two.   By mid-2008, more than $10 million of QELP's funds had been misappropriated by Cash in this manner.

6.    Grose actively assisted Cash in the scheme.   Cash and Grose traded e-mails wherein Cash would instruct Grose, to initiate wire transfers to Cash, and Grose would dutifully comply.   Grose, for his part, exploited QELP's lack of internal controls to steal approximately $1.8 million in funds rightfully belonging to QELP, in the form of illegal kickbacks and fictitious loans.   Both men are defendants in civil proceedings brought by each of the SEC and the Oklahoma Department of Securities ("ODS").   Both have been investigated by the FBI, the IRS, and the Department of Justice ("DOJ").   Grose and Cash have been criminally charged with wire fraud.

7.    Throughout the period from June 1, 2004 to the present, the Quest companies (defined below), including QELP lacked sufficient internal controls with regard to accounting practices and financial reporting.   While Cash and Grose were misappropriating millions of dollars from QELP, the other members of QELP's Board of Directors willfully looked the other way, tolerating a complete absence of any effective system of internal financial controls at QELP. These deficiencies included, among other things: (i) a lack of segregation of duties with respect to related party transactions; (ii) a lack of documentation and support for related-party transactions or "matched" transactions; (iii) failure to monitor or review multiple quarter-end transactions (at many

points tolerating $10 million transfers to and from the same third-party bank account on succeeding business days); and (iv) a lack of training in ethics and internal controls. As a result Cash and Grose were able to operate without any independent review and enjoyed unfettered ability to corrupt QELP's finances to serve their own purposes, eventually stealing nearly $12 million from QELP.

8.      Aware of large outgoing money transfers to an entity affiliated with Cash at the beginning, middle, and end of each fiscal quarter, QELP's outside auditors Murrell, Hall, McIntosh & Co., PLLP questioned Grose and Cash about the transactions. Cash and Grose manufactured elaborate stories about how the funds were going to Cash's controlled entity to fund "stealth" projects scouting potential oil and gas leases for QELP's benefit. Cash and Grose also claimed to have full Board authorization for the payments. Incredibly, the outside auditors never asked to review the Board authorization or minutes or even made a cursory review of the alleged "stealth" projects for which money was being paid into an account controlled by Cash. Moreover, the auditors failed to ask any further questions or perform any further investigation. Only through the dereliction or complicity of the other Board members and the outside auditors could Cash and Grose's naked scheme to pillage QELP continue in the manner it did for many years.

9.      As a result of Defendants' activities, QELP failed to disclose the related party transactions between QELP and Rockport Energy, and their effect on the Company's financial statements contained in its registration statement and amended registration statements filed with the SEC and in periodic filings with the SEC, including

5

its Class Period annual report and quarterly reports on Form 10-K and Forms 10-Q, respectively.

10.     On August 24, 2008 the truth was partially revealed when the Company disclosed that it had discovered approximately $10 million in questionable transfers from QELP to a bank account controlled by Cash.  On this news the price of QELP shares fell $3.22 per share or nearly 23% to $11.49 per share on heavy trading volume.

11.     The Company has been forced to restate several years' worth of financial statements and admit to a host of "material weaknesses" in its internal controls and other functions.

12.     Separate and apart from the above allegations, QELP and certain of the other defendants caused the IPO to proceed with a Registration Statement and Prospectus that contained materially false and misleading statements and omissions. Such misstatements and omissions related to the Company's financial statements and related party transactions, and resulted in the Plaintiffs and the other members of the Class purchasing QELP common units at prices that were artificially inflated.

## II.      JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 11, and 15 of the Securities Act (15 U.S.C. §§77k, , and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j (b) and 78t (a)), and Rule 10b-5 promulgated thereunder (12 C.F.R. § 240.10b-5)).

14.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22(a) of the Securities Act (15 U.S.C. § 77v (a)) and Section 27 of the Exchange Act (15 U.S.C. 78aa), and 28 U.S.C. §§ 1331 and 1337.

15.    Venue is proper in this Judicial District pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading financial and other information, occurred in substantial part in this District.    Additionally, the Company conducts business and maintains its principal executive offices in this Judicial District.

16.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III.    PARTIES

17.    Lead Plaintiffs Mark Barretti, Samuel Hyman, Leslie Sundquist, Billy Truit and Francis Biermeier, as set forth in the certifications accompanying the Barretti Group's Motion for Lead Plaintiff, incorporated by reference herein, purchased Quest Energy Partners, LP common units during the Class Period and pursuant to or traceable to the Company's Registration Statement and Prospectus filed in connection with the IPO and were economically damaged thereby.

18.    Defendant Quest Energy is a Delaware limited partnership with its principal executive offices located in Oklahoma City, Oklahoma.    Quest Energy's common units trade on the NASDAQ Global exchange under the ticker symbol "QELP." QELP is the oil and gas production operation arm of its parent, Quest Resource Corporation ("Quest Resource").    Quest Energy was formed in July 2007 by Quest Resource in order to conduct, in a master limited partnership structure, the exploration and production operations previously conducted by Quest Resource's wholly-owned

7

subsidiaries, Quest Cherokee, LLC ("Quest Cherokee") and Quest Cherokee Oilfield Service, LLC ("Quest Cherokee Oilfield Service"). With the effect of the IPO and related formation transactions Quest Cherokee became the wholly owned subsidiary of QELP.

19.     Defendant Quest Resource is a Nevada corporation with its principal executive offices located in Oklahoma City, Oklahoma.  Quest Resource is engaged in the exploration, development, production and transportation of natural gas.  Quest Resource divides its operations into two reportable business segments: (a) oil and gas production; and (b) natural gas pipelines — transporting, selling, gathering, treating and processing natural gas. Quest Resource is a controlling entity of QELP within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. The general partner of Quest Energy, Quest Energy GP, LLC, is a wholly owned subsidiary of Quest Resource.   Quest Resource also owns 57% of the limited partnership interests of QELP.   According to QELP's SEC filings, Quest Resource "owns 100% of our general partner and therefore controls the election of the board of directors of our general partner. Since our initial public offering, our general partner has had the same executive officers as [Quest Resource].  We do not have any employees, other than field level employees, and we depend on [Quest Resource] to provide us with all general and administrative functions necessary to operate our business. [Quest Resource] provides these services to us pursuant to the terms of the management services agreement between us and Quest Energy Service, LLC ("Quest Energy Service"), a wholly-owned subsidiary of [Quest Resource]. The management services agreement obligates Quest Energy Service to provide all personnel (other than field personnel) and any facilities, goods and equipment necessary to perform the services

8

we need including acquisition services, general and administrative services such as SEC reporting and filings, Sarbanes-Oxley compliance, accounting, audit, finance, tax, benefits, compensation and human resource administration, property management, risk management, land, marketing, legal and engineering."

20.    Defendant Quest Energy GP, LLC ("Quest Energy GP"), is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Oklahoma City, Oklahoma.  Quest Energy GP is the general partner of QELP and conducts, manages, and oversees the business of QELP. Moreover, Quest Energy GP owns 2% of the limited partnership units of QELP.  The Board of Directors of Quest Energy GP functions as the Board of Directors for QELP.

21.    Defendant Cash served as the Chief Executive Officer ("CEO"), President and Chairman of the Board of Directors of QELP's General Partner Quest Energy GP from July 2007 until his abrupt resignation announced on August 25, 2008.[2] Cash also served as CEO and Chairman of the Board of Directors of Quest Resource from November 2002 until August 25, 2008.  Cash was a controlling person of QELP within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. At all relevant times Cash owned a controlling interest in Rockport Energy, a Texas limited liability company.  Filings with the Texas Secretary of State list Cash as one of two directors and managers of Rockport Energy.  Cash is a citizen of Oklahoma.

22.    Defendant Grose served as the Chief Financial Officer ("CFO") of QELP's General Partner, Quest Energy GP, from July 2007 until he was placed on

_____

[2] Cash and other officers QELP's general partner and/or members of QELP's general partner's board of directors are referred to herein, at times, as officers and/or directors of QELP.

administrative leave on August 22, 2008. Grose also served as the CFO of Quest Resource from June 2004 until August 22, 2008, when he was placed on administrative leave. Grose was a controlling person of QELP within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. On September 13, 2008, Grose was terminated from all positions he held with Quest Resource, QELP and Quest Energy GP. Grose is a citizen of Oklahoma

23.     Defendant David C. Lawler ("Lawler") has served as a member of QELP's General Partner's Board of Directors since prior to QELP's inception as a public company in November 2007. He also served as Chief Operating Officer ("COO") of Quest Energy GP and COO of Quest Resource from July 2007 until May 2009. Lawler is a control person of QELP within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. Lawler is a citizen of Oklahoma.

24.     Defendant Gary Pittman ("Pittman") has served as a member of QELP's General Partner's Board of Directors since QELP's inception as a public company in November 2007. He has also been a member of the Audit Committee, the Conflicts Committee, and the Nominating Committee of the Board since November 2007. According to the Company's SEC filings Pittman meets the SEC's definition of an "audit committee financial expert based on his business and experience and background." Pittman is a control person of QELP within the meaning of Section 15 of the Securities Act and Section 20(a) of the Exchange Act. Pittman is a citizen of Virginia.

25.     Defendant Mark Stansberry ("Stansberry") has been a member of QELP's General Partner's Board of Directors since QELP's inception in November 2007. He is

a member of the Audit Committee (since November 2007), the Conflicts Committee, and the Nominating Committee. Stansberry is a citizen of Oklahoma.

26.    Defendant Murrell, Hall, McIntosh & Co. PLLP ("Murrell Hall") served as QELP's and its predecessor's[3] and Quest Resource's independent auditor from at least 2004 until August 1, 2008, when it resigned as QELP's and Quest Resource's independent registered public accounting firm. Murrell Hall entered into an agreement with Eide Bailly, LLP ("Eide Bailly") pursuant to which Eide Bailley acquired the operations of Murrell Hall, and certain of its professional staff and shareholders joined Eide Bailly. On August 1, 2008, and concurrently with the resignation of Murrell Hall, QELP, through and with the approval of the Audit Committee of QELP's general partner's Board of Directors, engaged Eide Bailly as its independent registered accounting firm. Murrell Hall is a professional limited liability partnership organized and exiting under the laws of the state of Oklahoma. Murrell Hall's principal place of business is in Norman, Oklahoma.

27.    Defendant Eide Bailly is a registered public accounting firm and the successor entity of Murrell Hall. Eide Bailly is a limited liability partnership organized and existing under the laws of the state of North Dakota. Eide Bailly served as QELP's independent auditor from August 1, 2008 until October 2008. Eide Bailly's principal place of business is in Fargo, North Dakota.

28.    Cash and Grose are collectively referred to sometimes herein as the "Officer Defendants."

---

[3] The historical financial statements of QELP's predecessor are comprised of Quest Resource's assets, liabilities and operations located in the Cherokee Basin (other than its midstream assets).

29.     Pittman, Lawler and Stansberry are collectively referred to sometimes herein as the "Director Defendants."

30.     Cash, Grose, Pittman, Lawler and Stansberry are collectively referred to sometimes herein as the "Individual Defendants."

31.     Because of their common ownership and control, QELP, Quest Energy GP and Quest Resource are referred to collectively as "Quest."

32.     The following diagram shows the relationship among the various Quest entities as it existed during the Class Period:



## IV.    CLASS ACTION ALLEGATIONS

33.    Plaintiffs bring this action as a class action on behalf of themselves and on behalf of a class of all purchasers of the common units of the Company during the period November 7, 2007 through August 24, 2008 (the "Class Period"), including persons or entities that purchased or otherwise acquired common units issued pursuant to and/or traceable to the Company's Registration Statement and Prospectus filed in connection with its IPO, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company's General Partner, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34.    The members of the Class are so numerous that joinder of all members is impracticable.  Approximately 9.1 million common units were sold in the IPO.  The precise number of the Class members is unknown to Plaintiffs at this time but it is believed to be in the thousands.  Members of the Class may be identified from records maintained by QELP or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

35.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws that are complained of herein.

36.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

14

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the provisions of the Securities Act were violated by Defendants' acts as alleged herein;

(b)     whether the provisions of the Exchange Act were violated by Defendants' acts as alleged herein;

(c)     whether documents, including the  Registration Statement and Prospectus, press releases, and quarterly and annual reports, and other public statements issued by Defendants to the investing public misrepresented material facts about the Company and its business; and

(d)     the extent to which members of the Class have sustained damages, and the proper measure of damages.

38.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Cash Misappropriates $10 Million from Quest

#### 1.     Cash Joins Quest but Continues Outside Business

39.     In 2002, Quest Resource acquired the natural gas-related assets of Cash's company, STP Cherokee, Inc.  Cash joined Quest Resource and served as its co-CEO until June 2004, when he became sole CEO.  Cash retained STP Cherokee, Inc.'s oil-related assets in a separate company that he also owned, STP Newco. In July

2007, Quest Resource formed QELP and Cash was named QELP's CEO, President and Chairman of the Board.

40.     After Cash became sole CEO in June 2004, he hired Grose.  Shortly thereafter, Cash and others formed Rockport Energy to exploit an oil and gas opportunity with a third party through a separate limited partnership (the "Rockport Energy partnership").    Rockport Energy was financed through Cash's personal contributions, bank loans and transfers from STP Newco.  Cash's personal assistant at Quest maintained the accounting records for Rockport Energy and STP Newco.  *See* Amended Complaint filed August 4, 2009 in SEC v. Cash, No. 09-CV-639-L (W.D. Okla.) ("SEC Complaint") at ¶ 14.[4]

41.     Rockport Energy was formed to acquire and develop oil and gas leases; however, within twelve months of its formation, it proved to be a poor investment.  By the end of 2004, Cash had lost approximately $2 million as a result of his investment in Rockport Energy. *See id.* at ¶ 14.

42.     In conjunction with the formation of Rockport Energy in June 2004, Cash opened and maintained a bank account in Rockport Energy's name at NBC Bank (the "NBC account" or the "Rockport account").    Cash did not disclose to his partners in Rockport Energy that he had opened the NBC account.  As a result, Cash retained sole signatory authority over the NBC account and arranged for the account statements to be delivered to his residence.  Cash used this account to funnel Quest funds to his personal account and to his private, non-Quest business ventures.  *See id.* at ¶ 15.

---

[4] After conducting a formal investigation, the SEC filed a civil enforcement action against Cash and Grose on June 17, 2009 in the United States District Court for the Western District of Oklahoma.

### 2.    The 2004 Transfers

43.    As soon as Cash hired Grose at QELP they immediately began misappropriating Quest funds.  In June and July 2004, Cash instructed Grose to transfer approximately $450,000 from Quest Resource to the NBC account in Rockport Energy's name.  Cash used the entire $450,000 for personal and non-Quest business purposes.  Even though Cash repaid the $450,000 in September 2004, these initial two transfers established a pattern of behavior of Cash and Grose of utilizing the NBC account to divert Quest funds to finance Cash's lavish lifestyle and non-Quest business ventures.  *See id.* at ¶15.

### 3.    The 2005 Transfers

44.    In June and September 2005, Quest Cherokee,[5] a Quest subsidiary, transferred a total of $700,000 to the Rockport account.  At the end of the third quarter in September, Cash "paid back" the $700,000 to Quest with a check drawn from the Rockport account. *See id.* at ¶ 17.

45.    The 2005 third quarter transfers began what materialized into a recurring quarterly sequence of Grose transferring Quest funds to the Rockport account at the beginning of the quarter — with additional amounts often being transferred during the quarter — and Cash returning the total amount of the transfers to Quest at the end of the quarter.  As soon as the Rockport account received the money, Cash then utilized virtually all of it to finance the Rockport partnership or for personal purposes.  *See id.* at ¶ 17.

---

[5] With the effect of the IPO and related formation transactions Quest Cherokee became wholly owned by QELP.

46.     The illegal transfers of Quest funds enabled Cash to fund his lavish lifestyle.   As an example, during the period when the transfers were ongoing Cash spent approximately $5 million on his Oklahoma City home, including $2.3 million paid to general contractors and other suppliers, $1.3 million paid to his interior decorator for furnishings and services, $1.3 million for landscaping services, $180,000 for a sound system and $46,000 for the purchase and maintenance of koi fish, an ornamental domesticated carp commonly kept for decorative purposes in outdoor ponds and water gardens.  Cash financed a fleet of luxury cars for himself and family members, leased a Malibu vacation home, and hired a full time gardener to care for his outlandish bamboo garden at his Oklahoma City estate, to whom he also provided a luxury sport utility vehicle.     During this time period, Cash paid off approximately $1.4 million of accumulated credit card debt.  *See id.* at ¶18.

47.     On October 5, 2005, Cash directed Grose to transfer $750,000 to the Rockport account.  Within one day of that transfer, Cash transferred the money to his personal account and to the Rockport Energy partnership.  During the fourth quarter of 2005, during which Quest (including Quest Cherokee) was transferring funds that would amount to approximately $2 million, Grose and Cash communicated via email about the transfers.  On November 28, 2005, Grose emailed Cash, evidencing both were acutely aware of the illegality of their transfers:   "Also, with the Sarbanes Oxley compliance under way, we need to discuss the dollar transactions with Quest, as the reviewers will note the transactions and we will have an SEC matter and more.  [Please] advise where we are at, so I can plan accordingly.  [T]hanks."  In response, Cash emailed Grose: "Rockport will have the funds back into Quest before the end of the year and there

should be no more transferring of funds after that."    Reneging on his pledge that no additional funds would be required, two weeks later on December 13, 2005 Cash instructed Grose to transfer an additional $1 million.  At the end of 2005, Cash, through Rockport Energy, repaid the $2 million that the Quest subsidiaries had transferred during the fourth quarter of 2005. *See id.* at ¶19.

48.    Grose knew that Cash required the transfers in order to finance his extravagant lifestyle and collateral business ventures.  Grose assisted Cash in paying the bills for Rockport Energy and the partnership. Consequently, he knew that Cash and his business ventures were running short of money.  By late 2005, Grose acknowledged in an email that Rockport Energy was "out of money." *See id.* at ¶20.

### 4.    The 2006-2008 Transfers

49.    Cash quickly realized that his personal lifestyle and side business ventures could not be sustained without the funding the illegal transfers provided.  In the first quarter of 2006, Cash directed Grose to transfer a total of $3 million from a Quest subsidiary that was part of QELP to Rockport.  Cash's emails to Grose from early 2006 continued to promise that the money would be returned and that no more transfers would be required.  For instance, on January 3, 2006, Cash directed Grose to send "one last wire" of $500,000 from a Quest subsidiary to Rockport Energy, while promising that the money would be repaid before the end of January. And one week later Cash directed Grose to send an additional $500,000 to Rockport Energy, again promising the money would be returned by the end of the month.  During February and early March 2006, Cash directed Grose to transfer approximately $2 million to Rockport Energy. *See id.* at ¶ 21.

50.     At the end of the first quarter 2006, Cash, through Rockport Energy, repaid the Quest subsidiary with a $3 million temporary check dated and deposited on March 31, 2006, the last day of the quarter.  On that date, the balance in the Rockport account was $28,847.39.  The check cleared only because on April 3, 2006, the first business day of the second quarter of 2006, Grose sent a $3 million wire transfer from Quest to the Rockport account.  After the first quarter of 2006, Cash continued to direct Grose to transfer funds, without bothering to make empty promises of prompt repayment.  *See id.* at ¶ 22.

51.     Cash and Grose employed a scheme known as "check kiting."  They took advantage of the "float," the time between the negotiation of the checks and their clearance at NBC Bank, to wire money from Quest to cover the checks drawn on the NBC Bank account which contained insufficient funds.

52.     The check-kiting scheme was repeated every quarter for more than two more years – Cash drafted a check from Rockport's account on the last business day of the quarter, delivered it to Grose to deposit in Quest's bank account, and before the check was presented for payment to NBC Bank, Grose wired the exact same amount from the Quest subsidiary to the NBC Bank account on the first business day of the subsequent quarter.  Cash, however, continued to direct additional transfers to Rockport Energy during the quarters, and the balance of the quarter-end "payments" increased to $8 million by the end of 2006 and to $10 million by the end of 2007. *See id.* at ¶23.

53.     In March 2008, however, a clerical error almost exposed the scheme. Pursuant to their usual practice, Cash gave Grose a $10 million Rockport Energy check on the last business day of first quarter 2008 in March 2008. A clerical error, however,

delayed the corresponding Quest $10 million wire transfer to Rockport Energy on the first business day in April. Because of the delay, Rockport Energy's NBC account did not have sufficient funds to cover the $10 million Rockport Energy check to Quest, and the check bounced. Both Grose and Cash worked diligently to correct the situation, and eventually, Cash contacted the bank and sorted out the error. *See id.* at ¶24.

54.     During the multiple years that Cash wrote multi-million dollar checks to "repay" Quest at the end of each quarter, the balance in the NBC account was approximately $1,800 at the end of seven quarters, and the quarterly ending balance never exceeded $112,000. Because Grose deposited the checks on the last business day of each reporting period, Quest in its financial statements reported cash balances that were from $2 million to $10 million higher than the amount of cash Quest actually had during the period. As a result, Quest materially overstated the cash in its financial statements from the third quarter of 2005 though the second quarter of 2008. Specifically, for each of the years ended December 31, 2005, 2006 and 2007, QELP and its predecessor's cash balances were overstated. *See id.* at ¶25.

**B.     Grose's Related Party Transactions**

**1.     The Kickback Scheme**

55.     Grose not only enabled and facilitated Cash's illicit transfers but also engaged in personal related party transactions effectuated to finance his lifestyle and business ventures. In late 2005, Grose and Douglas Brent Mueller ("Mueller"), Grose's close friend and Quest's purchasing manager, entered into a conspiracy with several of Quest's equipment vendors (led by Rodger H. Brooks ("Brooks")), the principal of

Equipment Vendors.[6]  In furtherance of this conspiracy, purchase orders for pipe and other equipment were diverted to Brooks and the Equipment Vendors in exchange for Grose and Mueller receiving kickbacks of one-third each of the profits earned on the transactions, including profits earned from sales of pipe and equipment to Quest.  After Brooks and the Equipment Vendors received payment on invoices submitted to Quest, the payment was divided in thirds and equally distributed to Brooks and the Equipment Vendors, Grose and Mueller.  Between December 2005 and August 2008, Brooks and the Equipment Vendors issued approximately 80 checks to Grose ranging in amounts from $600 to $86,666.66 and totaling more than $850,000.  Mueller was issued checks in similar amounts. *See id.* at ¶¶28-29.

56.    Grose and Mueller knew that Brooks and the Equipment Vendors did a substantial amount of business with Quest, since they submitted purchase orders to them and authorized payment of invoices – which two-thirds thereof would eventually be paid equally to Grose and Mueller for their role in the conspiracy.  QELP and Grose never disclosed these payments or the kickback scheme in Quest's SEC filings or disclosures. *See id.* at ¶29.

### 2.    Grose's $1 Million Personal Loan from Quest

57.    On June 30, 2008, Reliable Pipe & Equipment and Brooks invoiced Quest for a $1 million deposit in connection with a 2009 pipe order.  Grose wired $1 million as payment to Reliable on July 1, 2008, but, only minutes later, Mueller acting on Grose's

---

[6] The "Equipment Vendors" collectively refer to the following vendors that serviced Quest: Mid Continent Pipe & Equipment, LLC ("Mid Continent"), Reliable Pipe & Equipment, LLC ("Reliable Pipe & Equipment"), RHB Global, LLC ("RHB Global") and RHB, Inc. ("RHB").

instruction, called Brooks and canceled the order and told him to await instructions regarding refunding the $1 million.  Later that afternoon Grose called Brooks and instructed him to wire the $1 million refund, only the instructions were not to wire the money to Quest, but rather to an account owned by Oklahoma Hydrogen Gas Technologies, a start-up company.    The owner of Oklahoma Hydrogen Gas Technologies agreed to pay Grose five percent of his company's future profits in consideration for Grose's $1 million investment. Weeks later, Grose told Mueller that the $1 million was a loan that he planned to "repay" Quest by the end of the quarter.  As the scheme was unraveling, Grose attempted to collect the $1 million from Oklahoma Hydrogen Gas Technologies but the money had already been spent and was unrecoverable. *See id.* at ¶30.

**C.    Murrell Hall Recklessly Failed to Discover or Turned a Blind Eye to the Fraud**

58.    Throughout the life of the scheme QELP's outside auditors, Murrell Hall, disregarded numerous red flags that should have alerted it to the multi-year fraudulent scheme.

59.    The pattern of the scheme, which repeated like clockwork at the very beginning and ending of every quarter for more than two years was itself a red flag: Cash drafted a large check from the Rockport account on the last business day of the quarter, delivered it to Grose to deposit in Quest's bank account, and on the next business day before the check was presented for payment to NBC Bank, Grose wired the exact same amount from Quest to the Rockport account at NBC Bank to cover the check.

60.    Murrell Hall, in fact did take notice of the transfers, but amazingly did little to investigate them.

61.    During the March 2006 field work for the 2005 year end audit, QELP's auditors, Murrell Hall, questioned Grose about the $2 million transaction with Rockport Energy. Grose replied to the auditors' in an email: "I will provide you the details tomorrow, but a Quest activity and not RP [Rockport Energy], just appears on surface as such." In a subsequent conversation with the auditors, Grose gave his cover story for the transfers, explaining that Cash used Rockport Energy to "scout" oil and gas leases for Quest's benefit.   Despite the presence of a matching $2 million payment from Rockport Energy to Quest by the end of the same quarter, Murrell Hall accepted without further investigation Grose's misrepresentation. See id. at ¶24.

62.    In March 2008, Murrell Hall again questioned the transfers, which had grown to $10 million. Grose met with the audit partner, reiterated the story that the money was for Rockport Energy to pursue "stealth" projects for Quest, and told the auditors that the transactions were approved by Quest's board of directors and that the money was in an escrow account. Grose claimed that he had the board of directors' authorization and a copy of the escrow account statement. See id. at ¶24.

63.    Had Murrell Hall conducted the slightest professional diligence, the firm would have investigated the board's minutes and the purported authorization and discovered the ruse.   Once again, however, Murrell Hall did nothing, and the scheme was allowed to continue for several more months.

64.    Other "red flags," existed as well, that should have alerted Murrell Hall to the multi-year fraud, including the bounced check written on the Rockport account. It is

not surprising a check bounced given the exact timing needed to carry out Cash and Grose's scheme.  As alleged above, on the last business day of March 2008, Cash and Grose were attempting to kite a $10 million "repayment" check to Quest from Rockport Energy to cover the funds transferred to the account for Cash's personal use earlier that quarter. However, due to a clerical error at Quest's bank, the outgoing wire of the covering funds from Quest to Rockport Energy was delayed until after the first business day of the next quarter.  As a consequence Rockport Energy's "repayment" check was not honored. Again, despite this obvious "red flag" — the bouncing of a $10 million check from Rockport Energy at the very beginning of a quarter following a quarter in which the exact same amount of funds, $10 million, had been transferred to Rockport Energy — Murrell Hall failed to investigate the incident. Instead, Cash and Grose were able to arrange for the bank to honor the check and continue with the scheme.

### D.    The Schemes Unravel

65.    Cash's and Grose's schemes began to unravel in late July 2008 when the Company discovered the illegal transfers to Rockport Energy in connection with an inquiry by  the Oklahoma Department of Securities.

66.    In late July 2008, a Quest vice president discovered the transfers between Quest and Rockport Energy and alerted Defendant Lawler that Rockport Energy had $10 million of Quest's cash. Lawler questioned Grose, who assured him that Cash had provided documentation from Quest's Board approving the transfers and that Quest's auditors were aware of the arrangement. Lawler later questioned Cash, who explained that Rockport Energy was acting as an undisclosed agent for Quest in scouting possible oil and gas deals. Cash assured Lawler that he would pay the money back. Lawler also

contacted the auditors, who gave Lawler a similar explanation for the transfers. *See id.* at ¶31.

67.    As a result of Lawler's questioning of the transfers, Murrell Hall contacted Grose, who again told them that the money was used to scout deals for Quest. For the first time, however, Grose expressed concern that neither Rockport Energy nor Cash could repay the money.  Murrell Hall concluded that the quarterly transfers were nothing more than a series of kited checks. Ultimately, Murrell Hall insisted that Cash cause Rockport Energy to return the $10 million to Quest immediately, or it would not consent to the release of Quest's second quarter 2008 Form 10-Q. *See id.* at ¶32.

68.    On Monday, August 11, 2008, Cash gave Grose a Rockport Energy check for $10 million and Quest filed its Form 10-Q, after the auditors consented to its release. Grose, however, did not deposit the check that day and told another Quest employee that Cash had instructed him to "hang on to the check for a little bit." A few days later, Grose told this same employee that the payor bank had informed him the check would not clear. Grose held the Rockport Energy check for one week before finally depositing it on Monday, August 18, 2008. On August 22, 2008, the Company learned that the check had bounced. *See id.* at ¶33.

69.    Quest's Board scheduled a meeting for Friday, August 22, 2008.  Cash disappeared before the board meeting but, late on August 21, sent an email to a Board member stating, "I'm sorry I let you down but please take care of [my Wife], she had no idea of what I did, please take my stock in the company. . . . I take full responsibility." The next morning, Cash telephoned two Board members and confessed that he had taken $10 million from Quest. Quest's Board met on August 22, 2008 and, among other

things, engaged special counsel to investigate the transfers. On August 23, 2008, Cash resigned at the Board's insistence, which the Company announced the next business day. *See id.* at ¶34.

70.    During the August 22, 2008 Board meeting, directors questioned Grose about the transfers. He reiterated that he had Board authorization for the Rockport Energy transfers, then left the meeting and later provided special counsel two documents purporting to be minutes of Board meetings held on March 4, 2005 and October 3, 2006.  The purported 2005 minutes authorized establishment of an "escrow account" in an amount not to exceed $5 million to be used by the Company for "potential funding of opportunities that may arise from time to time."  The nearly identical purported 2006 minutes raised the escrow amount to $10 million. Both sets of minutes included what Grose purported to be Cash's signature. *See id.* at ¶35.

71.    In reality, however, the minutes were fake.  No Quest Board meetings occurred on the dates reflected in the purported minutes.  Moreover, the purported attendees of these meetings - two Board members and Quest's outside counsel – each denied that the meetings took place and that they authorized the transfers. *See id.* at ¶36.

### E.    Director Defendants Lawler, Pittman and Stansberry Recklessly Abandoned their Oversight Responsibilities

72.    In addition to their general fiduciary duties as directors, the QELP Directors assumed specific duties and responsibilities as a result of their Board and/or Committee positions. These specific duties are outlined in the Company's SEC filings and/or Code of Business Conduct and Ethics and/or specific charters of the Committees of the QELP Board.

27

73.    QELP adopted "Corporate Governance Guidelines" to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors and to "align the interests of directors and management with those of the Partnership's security holders." Among other things, the Corporate Governance Guidelines provided that "[o]n behalf of and for the benefit of the security holders of the Partnership, the Board is to provide effective governance over the Partnership's affairs and oversight of the Partnership's business conducted by the Company and the Company's employees, managers and officers under the direction of the Chief Executive Officer." The Guidelines specified that each director "has a duty to spend the time and effort necessary in order to be informed about the business and affairs of the partnership and to discharge properly such director's responsibilities."

74.    In addition to the Board's general oversight of management, the Guidelines prescribe that the Board or a committee thereof shall also perform a number of specific functions, including:

1.    Reviewing, approving and monitoring fundamental financial and business strategies and major partnership actions;

2.    Assessing major risks facing the Partnership and reviewing options for their mitigation;

3.    Ensuring processes are in place for maintaining the integrity of the Partnership and its financial statements, compliance with law, high ethics and relationships with customers, suppliers, and securityholders, including periodic training for employees of the Partnership or the Company to assure that legal and ethical requirements are understood and current;

4.    Review, and where appropriate, approve and evaluate policies for corporate conduct, including maintenance of disclosure controls and procedures, accounting, financial and other controls, and reviewing the adequacy of compliance systems and controls; and

28

5.   Evaluating periodically the overall effectiveness of the Board.

6.   The Board will consult with the Quest Resource Corporation Board of Directors and/or the appropriate committees regarding the selection, evaluation, compensation, development and retention of the CEO and other executive officers of the Company.

75.   The directors who served on the Audit Committee during the Class Period, Pittman and Stansberry, assumed even greater duties. QELP's Audit Committee was charged with overseeing the accounting and financial reporting processes of QELP and the audits of the Company's financial statements. These duties included oversight responsibilities regarding the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the independent auditor's qualifications and independence, and the performance of the Company's internal audit function and independent auditor. The Audit Committee met periodically with the Company's outside auditors, including at least once per quarter to review the accuracy and integrity of the Company's public financial statements for that quarter.

76.   In its Class Period SEC filings the Company disclosed:

The audit committee assists the board of directors in its oversight of the integrity of our financial statements and our compliance with legal and regulatory requirements and partnership policies and controls. The audit committee has the sole authority to retain and terminate our independent registered public accounting firm, to approve all auditing services and related fees and the terms thereof, and to pre-approve any non-audit services to be rendered by our independent registered public accounting firm. The audit committee also is responsible for confirming the independence and objectivity of our independent registered public accounting firm. Our independent registered public accounting firm will be given unrestricted access to the audit committee.

77.   Throughout the Class Period, QELP's Board and its Audit Committee failed to conduct little if any oversight of the Company's internal controls over accounting, cash flow and financial reporting and consciously disregarded their duties to

monitor such controls and accounting. These defendants thus completely failed to perform their duties in good faith to prevent Cash and Grose's transfer of Company funds to themselves for unlawful personal gain and the resulting misrepresentations in the Company's SEC filed reports and financial statements.

78.     Indeed, in its Amended Complaint filed against Cash and Grose on August 4, 2009, the SEC alleged that "Cash and Grose…exploited the companies' lax internal controls to misappropriate millions from the companies through insider loans that were also undisclosed related party transactions."

**F.    Defendants' False and Misleading Statements Under The Securities Act**

79.     On July 19, 2007, the Company filed its Registration Statement with the SEC.  After five amendments on September 6, 2007, September 28, 2007, October 22, 2007, October 29, 2007 and October 31, 2007 the Registration Statement became effective on November 7, 2007.  The amended Registration Statement on Form S-1/A filed on October 31, 2007, contained, among other things, a Prospectus (the Registration Statement and Prospectus are referred sometimes herein jointly as the "Registration Statement").   The Registration Statement was signed by Defendants Cash, Grose and Lawler.  Defendants Stansberry and Pittman as director nominees each signed consents filed with the SEC in connection with the Registration.

80.     On November 7, 2007, Pittman and Stansberry were appointed to the board of directors of QELP's general partner, Quest Energy GP.  These appointments were effective upon the effectiveness of QELP's Registration Statement on Form S-1 relating to the public offer and sale of the common units pursuant to the Underwriting Agreement (defined below).

81.    On November 8, 2007, QELP entered into an underwriting agreement (the "Underwriting Agreement") with Quest Resource, Quest Energy GP, Quest Cherokee, and Wachovia Capital Markets, LLC and RBC Capital Markets Corporation, as representatives of the several underwriters (collectively, the "Underwriters"), providing for the offer and sale in a firm commitment underwritten offering of 9,100,000 common units representing limited partner interests in QELP ("Common Units") at a price of $18.00 per Common Unit ($16.83 per Common Unit, net of underwriting discount). Pursuant to the Underwriting Agreement, QELP granted the underwriters a 30-day option to purchase up to an additional 1,365,000 Common Units at the same price.  On November 9, 2007 the Company filed its Prospectus with the SEC for the offering of 9.1 million common units priced at $18.00 per unit.

82.    On November 15, 2007 QELP completed its IPO and received net proceeds of $151.2 million.

83.    In its Registration Statement, QELP included audited financial statements of Quest Energy Partners Predecessor, the predecessor to QELP, as of May 31, 2004 and December 31, 2004, 2005 and 2006 and for the fiscal year ended May 31, 2004, the seven months ended December 31, 2004 and the fiscal years ended December 31, 2005 and 2006.[7]    The Registration Statement also contained un-audited financial statements for the six months ended June 30, 2006 and 2007. Included in the Registration Statement, were carve out balance sheets of QELP as of December 31, 2005 and 2006, and the related carve out statements of operations, cash flows and

---

[7] According to the S-1/A filed by the Company on October 31, 2007, Quest Energy Partners Predecessor changed its fiscal year end from May 31 to December 31 effective as of January 1, 2005.

partners' capital for the year ended May 31, 2004, the seven months ended December

31, 2004 and the years ended December 31, 2005 and 2006, audited by Murrell Hall.

The following table summarizes QELP's reported financial results (in thousands):

| Statement of Operations Data | | | Quest Energy Partners Predecessor | | | |
|---|---|---|---|---|---|---|
| | 5/31/04 | 12/31/04 | 12/31/05 | 12/31/06[8] (Restated) | 6/30/06 (Unaudited) | 6/30/07 (Unaudited) |
| Revenues | $27,243 | $24,238 | $44,952 | $65,468 | $33,718 | $53,384 |
| Net Income (loss) | $2,959 | ($2,818) | ($25,192) | ($47,549) | $5,574 | $8,924 |

| Statement of Operations Data | Quest Energy Partners, L.P. Pro Forma | |
|---|---|---|
| | 12/31/06 (Unaudited) | 6/30/07 (Unaudited) |
| Revenues | $65,468 | $53,384 |
| Net Income (loss) | ($39,283) | $2,214 |

84.    The Company also reported Partners' equity of $51.09 million and

$69.547 million as of December 31, 2006 and December 31, 2005, respectively.

85.    The Registration Statement and the financial statements set forth therein

failed to disclose the related party transactions between Cash and Grose and Rockport

---

[8] According to the S-1/A filed by the Company on October 31, 2007, certain changes were made to carve out assumptions resulting in the understatement of previously recorded cash and partners' capital as of December 31, 2006.

Energy and misstated QELP's financial condition and results and were therefore materially false and misleading.

86.    The financial information contained in the Registration Statement was materially false and misleading at the time it was reported.  Beginning on January 2, 2009, the Company admitted that its financial statements included in the Registration Statement could no longer be relied upon and the Company subsequently restated those financial statements.

87.    The financial statements contained in the Registration Statement were purportedly audited by Murrell Hall, which consented to the inclusion of its unqualified audit reports therein.

88.    In the Registration Statement, defendant Murrell Hall stated the following:

We have audited the accompanying carve out balance sheets of Quest Energy Partners, L.P. Predecessor (the "Company") as of December 31, 2005 and 2006, and the related carve out statements of operations, cash flows and partners' capital for the year ended May 31, 2004, the seven months ended December 31, 2004 and the years ended December 31, 2005 and 2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the carve out financial position of the Company as of December 31, 2005 and 2006, and the carve out results of its operations, cash flows and partners' capital for the year ended May 31, 2004, the seven months ended December 31, 2004 and the years ended December 31, 2005 and 2006, in conformity with accounting principles generally accepted in the United States of America.

***

We have audited the balance sheet of Quest Energy Partners, L.P. as of July 19, 2007. This financial statement is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the balance sheet referred to above presents fairly, in all material respects, the financial position of Quest Energy Partners, L.P. as of July 19, 2007 in conformity with accounting principles generally accepted in the United States of America.

89.    Defendant Murrell Hall specifically consented to the use of its audit reports by QELP in the Registration Statement.  Defendant Murrell Hall's consent was attached to the Registration Statement as Ex 23.1

90.    Since the Company has announced that the financial statements can no longer be relied upon and has since restated those financial statements because they

34

violated GAAP with respect to, among other things, related party transactions and that Murrell did not conduct its audits in accordance with GAAS, Defendant Murrell Hall's certifications in ¶88 above were materially false and misleading.

**G.    Defendants' False and Misleading Statements Under the Exchange Act**

91.    The Registration Statements, financial statements included therein and the Amendments to the Registration Statements were materially false and misleading for the reasons set forth in ¶85-90, above.

92.    On December 21, 2007, QELP filed with the SEC its quarterly report on Form 10-Q for the third quarter ending September 30, 2007.  The Form 10-Q was signed by Cash and Grose.

93.    The Form 10-Q contained unaudited financial statements of Quest Energy Partners' Predecessor. With respect to same QELP reported revenues of $28.494 million and net income of $1.372 million for the three month period ending September 30, 2007.    QELP further reported Partnership equity of $368.133 million as of September 30, 2009.

94.    The Form 10-Q stated the following with respect to the Company's internal control over financial reporting:

> Our management, including the Chief Executive Officer and the Chief Financial Officer, evaluated the effectiveness of the design and operation of our disclosure controls and procedures pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 as of September 30, 2007. There are inherent limitations to the effectiveness of any system of disclosure controls and procedures, including the possibility of human error and the circumvention or overriding of the controls and procedures. Accordingly, even effective disclosure controls and procedures can only provide reasonable assurance of achieving their control objectives. Based upon this evaluation, the Chief Executive Officer and the Chief Financial Officer concluded that the design and operation of our disclosure controls and procedures were effective as of such date to provide reasonable

assurance that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure.

95.    In addition Defendants Cash and Grose signed certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act in which they certified that the Form 10-Q did not contain materially false and misleading statements and that QELP's internal controls over financial reporting were effective. In particular the Section 302 certification provided:

1.    I have reviewed this quarterly report on Form 10-Q of Quest Energy Partners L.P.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this Quarterly Report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this Quarterly Report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and we have:

a)    designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly

during the period in which this Quarterly Report is being prepared;

b)    designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles

c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

96.    The Section 906 certifications provided:

[T]o my knowledge:

    1.      The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

    2.      The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Partnership.

97.    The Form 10-Q, the financial statements contained therein and the certifications of Cash and Grose were materially false and misleading because, among other things, Defendants misrepresented that QELP's control over financial reporting was effective when it was not, Defendants failed to disclose the related party transactions between QELP and Rockport Energy and their effects on the Company's financial statements, and misrepresented the Company's financial results and condition.

98.    On March 11, 2008 the Company announced its financial results for the fourth quarter 2007.  The press release announcing same provided in pertinent part:

OKLAHOMA CITY – March 11, 2008 – Quest Energy Partners L.P. (NASDAQ: QELP) a natural gas and oil and gas master limited partnership (MLP) that was formed from the contribution of certain natural gas and oil producing properties from Quest Resource Corporation (NASDAQ: QRCP), today announced unaudited results for its fourth quarter 2007 and provided updated guidance for full year 2008.

The Partnership's fourth quarter began on November 15, 2007, when its initial public offering was completed, and ended on December 31, 2007. This unaudited financial information provided in this release is preliminary and subject to adjustments in connection with the final audited financial statements to be released on or about March 30, 2008 within the Partnership's Annual Report on Form 10-K.

Adjusted earnings before interest, income taxes, depreciation and amortization (Adjusted EBITDA), a non-GAAP measure, totaled $6.4 million for the period. A distribution of $4.4 million was paid on February 14, 2008 to unit holders of record at the close of business on February 7, 2008 based on an annualized distribution rate of $1.60 per unit. Adjusted EBITDA is reconciled to Net Income and Net Cash from Operating

Activities, its most directly comparable GAAP measures in the attached financial schedules.

The net loss for the period totaled $18.5 million as results were impacted by approximately $13.1 million of interest expense associated with the Partnership's early retirement of debt with proceeds from its initial public offering and a $6.1 million unrealized loss on derivative instruments.

99.    The Company also reported revenues in the amount of $15.864 million, cash and cash equivalents of $10.175 million and total members' equity of $228.7 million.

100.    On March 31, 2008, the Company filed its annual report for the year ending 2007 with the SEC on Form 10-K. The Form 10-K was signed by Defendants Cash, Grose, Lawler, Pittman and Stansberry.   The Form 10-K contained the same false and misleading financial results for the fourth quarter 2007 (November 15, 2007 through December 31, 2007), cash and cash equivalents and total members' equity published in the Company's March 11, 2008 press release.   The Form 10-K further falsely reported revenues of $97.148 million and net loss of ($19.191) million for the carve-out period January 1, 2007 through November 14, 2007 for QELP's Predecessor. Defendants also misrepresented that the Company's internal control over financial reporting was effective when it was not:

> We have established and maintain a system of disclosure controls and procedures to provide reasonable assurances that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this report, the principal executive officer and principal financial officer of our general partner have concluded that our disclosure controls and procedures as of December 31, 2007 were effective, at a reasonable assurance level, in ensuring that the information required to be disclosed by us in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC.

101.   In addition, Defendants Cash and Grose again signed certifications, identical to those set forth in ¶¶ 95-96, above, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act in which they certified that the Form 10-K did not contain any materially false and misleading statements and that QELP's internal controls over financial reporting were effective.

102.   The Form 10-K also contained financial statements audited by Murrell Hall, along with Murrell Hall's unqualified opinions concerning those financial statements:

> We have audited the accompanying consolidated balance sheet of Quest Energy Partners, L.P. and subsidiaries (the "Partnership") as of December 31, 2007, and the related consolidated statements of operations, cash flows and partners' equity for period from November 15, 2007 through December 31, 2007. These consolidated financial statements are the responsibility of the Partnership's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

> We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). The Partnership is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Partnership's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of the Partnership as of December 31, 2007, and the consolidated results of its operations and its cash flows for period from November 15, 2007 through December 31, 2007, in conformity with accounting principles generally accepted in the United States of America.

***

We have audited the accompanying carve out balance sheets of the Predecessor as defined in Note 3 to the consolidated/carve out financial statements, (the "Predecessor"), as of December 31, 2006, and the related carve out statements of operations, cash flows and partners' capital for the period from January 1, 2007 through November 14, 2007 and for the years ended December 31, 2006 and 2005. These financial statements are the responsibility of the Predecessor's management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Predecessor's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Predecessor's internal control over financial reporting. Accordingly, we express no such opinion. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the carve out financial position of the Predecessor as of December 31, 2006, and the related carve out statements of operations, cash flows and partners' capital for the period from January 1, 2007 through November 14, 2007 and for the years ended December 31, 2006 and 2005, in conformity with accounting principles generally accepted in the United States of America.

103.    The March 11, 2008 press release, the Form 10-K, the financial statements contained therein and the certifications of Cash and Grose were materially false and misleading because, among other things, Defendants misrepresented that QELP's control over financial reporting was effective when it was not, Defendants failed to disclose the related party transactions between QELP and Rockport Energy and their

effects on the Company's financial statements and misrepresented the Company's financial results and condition.

104.   The statements made by Murrell Hall in their audit reports were materially false and misleading because QELP's financial statements did not present fairly QELP's financial position in accordance with GAAP and Murrell Hall did not conduct its audits in accordance with GAAS.

105.   On May 15, 2008 the Company filed its quarterly report for the first quarter 2008 with the SEC on Form 10-Q.  The Form 10-Q was signed by Defendants Cash and Grose.  The Form 10-Q falsely reported revenues of $37.403 million and a net loss of ($17.346) million for the period and net partners' equity of $174.676 million as of March 31, 2008.

106.   The Form 10-Q also made the following false and misleading disclosures concerning the Company's internal control over financial reporting:

> We have established and maintain a system of disclosure controls and procedures to provide reasonable assurances that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based on the evaluation of our disclosure controls and procedures as of the end of the period covered by this report, the principal executive officer and principal financial officer of our general partner have concluded that our disclosure controls and procedures as of March 31, 2008 were effective, at a reasonable assurance level, in ensuring that the information required to be disclosed by us in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and is accumulated and communicated to our management, including our principal executive officer and principal financial officer of our general partner, as appropriate, to allow timely decisions regarding required disclosure.

107.   In addition, Defendants Cash and Grose again signed certifications, identical to those set forth in ¶¶ 95-96, above, pursuant to Sections 302 and 906 of the

Sarbanes-Oxley Act in which they certified that the Form 10-Q did not contain materially false and misleading statements and that QELP's internal controls over financial reporting were effective.

108.    The Form 10-Q, the financial statements contained therein and the certifications of Cash and Grose were materially false and misleading because, among other things, Defendants misrepresented that QELP's control over financial reporting was effective when it was not, Defendants failed to disclose the related party transactions between QELP, Rockport Energy, and Cash and their effects on the Company's financial statements, and Defendants misrepresented the Company's financial results and condition.

109.    On July 23, 2008, the Company filed a registration statement with the SEC on Form S-1.    The registration statement was signed by Defendants Cash, Grose, Lawler, Pittman and Stansberry.

110.    In the registration statement, QELP incorporated QELP financial statements and the carve out financial statements of QELP's predecessor, all appearing in the Annual Report on Form 10-K of QELP for the year ending December 31, 2007.

111.    Defendant Murrell Hall specifically consented in Exhibit 23.2 to the Registration Statement, to the incorporation in the Registration Statement of QELP on Form S-1, Murrell Hall's unqualified audit reports dated March 28, 2008 related to (i) the consolidated financial statements of QELP and (ii) the carve out financial statements of QELP's predecessor, all appearing in the Annual Report on Form 10-K of QELP for the year ended December 31, 2007.

112.   The Registration Statement and financial statements incorporated therein were materially false and misleading because, among other things, Defendants misrepresented that QELP's control over financial reporting was effective when it was not, Defendants failed to disclose the related party transactions between QELP, Rockport Energy, and Cash and their effects on the Company's financial statements, and the Defendants misrepresented QELP's financial results and condition.

113.   Murrell Hall's unqualified audit reports of QELP's financial statements incorporated into the Registration Statement were false and misleading because QELP's financial statements did not present QELP's financial position fairly in accordance with GAAP and Murrell Hall's audits were not conducted in accordance with GAAS.

114.   On August 11, 2008, the Company filed its quarterly report for the second quarter 2008 with the SEC on Form 10-Q.

115.   The Form 10-Q was signed by Defendants Cash and Grose.  The Form 10-Q falsely reported revenues of $39.972 million and net income of $16.221 million for the three month period ending June 30, 2008 and revenues of $53.384 million and a net loss of ($1.125) million for the six month period ending June 30, 2008.  The Company falsely reported net partners' equity of $80.110 million as of June 30, 2008.

116.   The Form 10-Q also made the following false and misleading disclosure concerning the Company's internal control over financial reporting:

> We have established and maintain a system of disclosure controls and procedures to provide reasonable assurances that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based on the evaluation of our disclosure controls and procedures as of the end of the

period covered by this report, the principal executive officer and principal financial officer of our general partner have concluded that our disclosure controls and procedures as of June 30, 2008 were effective, at a reasonable assurance level, in ensuring that the information required to be disclosed by us in reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and is accumulated and communicated to our management, including our principal executive officer and principal financial officer of our general partner, as appropriate, to allow timely decisions regarding required disclosure.

117.    In addition, Defendants Cash and Grose again signed certifications, identical to those set forth in ¶¶ 95-96, above, pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act in which they certified that the Form 10-Q did not contain materially false and misleading statements and that QELP's internal controls over financial reporting were effective.

118.    The Form 10-Q, the financial statements contained therein and the certifications of Cash and Grose were materially false and misleading because, among other things, Defendants misrepresented that QELP's control over financial reporting was effective when it was not, Defendants failed to disclose the related party transactions between QELP, Rockport Energy, and Cash and their effects on the Company's financial statements, and Defendants misrepresented the Company's financial results and condition.

## H.    The Truth Is Revealed

119.    The truth was partially revealed in a Company announcement issued on August 25, 2008.  The announcement stated in relevant part:

Quest Announces Resignation of Jerry Cash; David Lawler Named President; Boards Form Joint Special Committee to Conduct Investigation
Monday August 25, 9:00 am ET

OKLAHOMA CITY, OK--(MARKET WIRE)--Aug 25, 2008 -- The boards of directors of Quest Resource Corporation (QRCP - News), Quest Energy

Partners, L.P. (NasdaqGM:QELP - News) and Quest Midstream Partners, L.P. announced they have accepted the resignation of Jerry Cash, as Chairman and CEO of all three entities, effective immediately. The resignation followed the discovery, in connection with an inquiry from the Oklahoma Department of Securities, of questionable transfers of company funds to an entity controlled by Mr. Cash. Initial indications are that the amount in question appears to involve about $10 million.

Promptly following the discovery, members of the three boards met in joint sessions on Friday and over the weekend. The boards immediately formed a Joint Special Committee comprised of representatives from each board, including the chairs of the audit committees of Quest Resource Corporation and Quest Energy Partners, to investigate the matter and consider the effects on the companies' financial statements. The Joint Special Committee has retained Spencer C. Barasch of Andrews Kurth LLP to lead the investigation. Chief Financial Officer David Grose was placed on a paid administrative leave of absence during the investigation. Quest has reported this matter to, and intends to fully cooperate with, the U.S. Securities and Exchange Commission and other appropriate governmental and regulatory organizations.

The boards also announced they have unanimously elected David Lawler as president of each entity and have appointed him as a director of Quest Resource Corporation to fill the vacancy created by Cash's resignation.

* * *

The company has retained Kroll Zolfo Cooper LLC to assist in the accounting and finance functions during Mr. Grose's absence. Kevin Golmont will be leading Kroll Zolfo Cooper's efforts in this capacity.

The boards have also formed a Joint Strategic Review Committee comprised of one representative of each of the boards to assist Lawler in undertaking a detailed review of each entity's strategy.

"The boards have tremendous confidence in David's abilities," said Jay Rateau, lead director for Quest Resource Corporation. "During his tenure as COO, David has displayed exceptional leadership skills and demonstrated sound financial and technical ability," Rateau added.

"I appreciate the board members' confidence in my ability to lead the Quest entities. In my prior role of COO, I learned the strength of our organization comes from our dedicated employees and our assets. I will work with our employees and board members to continue to execute our business plans as I conduct a strategic review of each organization," said David Lawler.

120.    This announcement shocked the market and caused the Company's common units to fall $3.22 per share or nearly 22.7% to $11.49 per share on August 25, 2008.

121.    On August 30, 2008, the Oklahoma Department of Securities posted a news headline on its website.  The release revealed that the Oklahoma Department of Securities had filed a petition in the District Court of Oklahoma County, Oklahoma seeking an injunction and to freeze defendant Cash's assets.   The release also revealed that the entity to which Cash improperly transferred Company assets was Rockport Energy, an entity controlled by Cash.  The article stated in relevant part:

State Sues ex-CEO of Quest Resource

Sat August 30, 2008

The former chief executive officer and chairman of Quest Resource Corp. is accused by state regulators of improperly moving money out of company accounts for his own benefit.

The Oklahoma Department of Securities filed a civil suit Friday against Jerry Cash, and also obtained a temporary injunction against the former company officer and an order freezing his assets.

According to a petition filed in Oklahoma County District Court, regulators accuse Cash of transferring money from Quest Resource Corp. or its subsidiary, Quest Energy Partners, into an account held by Rockport Energy, a Texas limited liability company.

Once the money was there, he is accused of using it "for personal expenses and/or other business activities not authorized by the boards of directors of either Quest Resource Corp. or Quest Energy Partners," the petition said.

Cash, authorities said, did not admit nor deny the allegations Friday. He did, however, consent to the temporary injunction and the order freezing his assets.

He resigned from his positions with Quest Resource Corp. and Quest Energy Partners once state regulators began investigating. Also, David

Grose, Quest's chief financial officer, has been placed on paid administrative leave.

David Lawler, the company's chief operating officer and a director of Quest Energy Partners, has been appointed to take Cash's place on an interim basis.

Lawler, who had worked there just more than a year, also was appointed as a director of Quest Resource Corp.

What the petition alleges:

The court petition accuses Cash of having engaged in a series of suspicious financial transactions between Rockport Energy and Quest Resource Corp. and Quest Energy Partners.

At least three years ago, Cash is accused of having sent an unspecified amount of Quest Resource and/or Quest Energy money to Rockport Energy's bank account.

Then, beginning in 2005, on or within a day of the end of each fiscal quarter for the Quest companies, Cash is accused of having issued a Rockport check back to Quest or one of its entities in amounts ranging from $400,000 to $10 million. The account never had enough money to cover the checks, the petition states.

And then, on the day following the end of each fiscal quarter for the Quest companies, Cash is accused of having sent Quest funds again to Rockport, in amounts identical to what the Rockport checks were written for — enabling the Rockport checks to clear.

State officials accuse Cash of having received "a substantial, and as yet undetermined, amount of money" from the fund shuffles, the petition says.

A spokeswoman for Quest Resource Corp. late Friday did not have an immediate reaction to the charges.

Calls placed to Cash's home on Friday were not returned.

Stock performance was poor this week:

It was a bad week for Oklahoma City-based Quest Resource Corp. and its subsidiary, Quest Energy Partners, while state regulators and company officials continued their investigation into the allegations of questionable cash transfers.

Quest Energy Partners' stock lost about 20 percent of its value between the market close on Aug. 22, when it was worth $14.17, and the market

close on Friday when it was worth $11.41. But it lost the majority of that during the weekend. During this week's trading, the stock's value remained fairly constant.

Quest Resource Corp.'s stock did even worse. It lost about 30 percent of its value, from $6.93 a share when markets closed Aug. 22 to $4.81 when markets closed on Friday.

122.   In a Form 8-K dated December 31, 2008 and filed January 2, 2009 QELP stated that on December 31, 2008, the Board of Directors of Quest Energy GP, the general partner of QELP, determined that the following financial statements should no longer be relied upon:

- the Partnership's [QELP] audited consolidated financial statements as of December 31, 2007 and for the period from November 15, 2007 through December 31, 2007;

- the Partnership's [QELP] unaudited consolidated financial statements as of and for the three months ended March 31, 2008 and as of and for the three and six months ended June 30, 2008; and

- the Predecessor's audited consolidated financial statements as of and for the years ended December 31, 2005 and 2006, as of November 14, 2007 and for the period from January 1, 2007 through November 14, 2007. These financial statements represent the carve out financial position, results of operations, cash flows and changes in partners' capital of the Cherokee Basin Operations of Quest Resource Corporation, the Partnership's parent (the "Parent"), and reflect the operations of Quest Cherokee, LLC ("Quest Cherokee") and Quest Cherokee Oilfield Services, LLC, formerly owned by the Parent located in the Cherokee Basin (other than its midstream assets), which the Parent contributed to the Partnership at the completion of its initial public offering on November 15, 2007 (the "Predecessor").

123.   As a result of the errors the Board had identified in the previous financial statements, QELP was also obliged to announce that it had "material weaknesses in its internal control over financial reporting, including its entity level controls, controls related to the accounting for derivative instruments, controls related to the determination of

impairment and the calculation of depletion of oil and gas properties, and controls over the accounting for equity based compensation."

124.  QELP also announced that it would have to issue restated financial statements.

125.  On January 28, 2009, QELP announced that its Board of Directors had decided to suspend distributions of QELP common units.  On this news, the price of QELP shares fell $1.97, or 48%, that same day on heavy trading volume.

126.  It took many months to sort out the problems, however, with the result that QELP missed its deadlines for making multiple filings with the SEC.  Restated financials became available in mid-June 2009, beginning when QELP filed its long-delayed 2008 Form 10-K.

127.  The Form 10-K is staggering in the sheer number and scope of the line items that were restated to bring QELP's financial statements into accuracy and compliance with GAAP.  The Form 10-K states:

> A joint special committee comprised of one member designated by each of the boards of directors of Quest Energy GP, QRCP, and Quest Midstream GP was immediately appointed to oversee an independent internal investigation of the Transfers. In connection with this investigation, other errors were identified in prior year financial statements and management and the board of directors concluded that we had material weaknesses in our internal control over financial reporting. As of December 31, 2008, these material weaknesses continued to exist. QRCP has advised us that it is currently in the process of remediating the weaknesses in internal control over financial reporting referred to above by designing and implementing new procedures and controls throughout QRCP and its subsidiaries and affiliates for whom it is responsible for providing accounting and finance services, including us, and by strengthening the accounting department through adding new personnel and resources. QRCP has obtained, and has advised us that it will continue to seek, the assistance of the audit committee of our general partner in connection with this process of remediation.

As reported on a Current Report on Form 8-K initially filed on January 2, 2009 and amended on February 6, 2009, on December 31, 2008, the board of directors of Quest Energy GP determined that our audited consolidated financial statements as of December 31, 2007, and for the period from November 15, 2007 to December 31, 2007, our unaudited consolidated financial statements as of and for the three months ended March 31, 2008 and as of and for the three and six months ended June 30, 2008 and the Predecessor's audited consolidated financial statements as of and for the years ended December 31, 2005 and 2006, and for the period from January 1, 2007 to November 14, 2007 should no longer be relied upon. The Predecessor's financial statements represent the carve out financial position, results of operations, cash flows and changes in partners' capital of the Cherokee Basin operations of QRCP, and reflect the operations of Quest Cherokee and QCOS, located in the Cherokee Basin (other than its midstream assets), which QRCP contributed to us at the completion of our initial public offering on November 15, 2007.

Additionally, the amended 8-K reported that our management had concluded that the reported cash balances and partners' equity of the Predecessor will be reduced by a total of $9.5 million as of November 14, 2007, which represents the total amount of the Transfers that had been funded by Quest Cherokee as of the closing of our initial public offering. …

Restatement and Reaudit — In October 2008, Quest Energy GP's audit committee engaged a new independent registered public accounting firm to audit our consolidated financial statements for 2008 and, in January 2009, engaged them to reaudit our consolidated financial statements as of December 31, 2007 and for the period from November 15, 2007 to December 31, 2007 and the Predecessor's audited consolidated financial statements as of and for the years ended December 31, 2005 and 2006, and for the period from January 1, 2007 to November 14, 2007.

The restated consolidated financial statements included in this Form 10-K correct errors in a majority of the financial statement line items in the previously issued consolidated financial statements for all periods presented. The most significant errors (by dollar amount) consist of the following:

- The Transfers [to Cash], which were not approved expenditures, were not properly accounted for as losses.

- Hedge accounting was inappropriately applied for our commodity derivative instruments and the valuation of commodity derivative instruments was incorrectly computed.

- Errors were identified in the accounting for the formation of Quest Cherokee in December 2003 in which: (i) no value

was ascribed to the Quest Cherokee Class A units that were issued to ArcLight Energy Partners Fund I, L.P. ("ArcLight") in connection with the transaction, (ii) a debt discount (and related accretion) and minority interest were not recorded, (iii) transaction costs were inappropriately capitalized to oil and gas properties, and (iv) subsequent to December 2003, interest expense was improperly stated as a result of these errors. In 2005, the debt relating to this transaction was repaid and the Class A units were repurchased from ArcLight. Due to the errors that existed in the previous accounting, additional errors resulted in 2005 including: (i) a loss on extinguishment of debt was not recorded, and (ii) oil and gas properties and retained earnings were overstated. Subsequent to the 2005 transaction, depreciation, depletion and amortization expense was also overstated due to these errors.

- Certain general and administrative expenses unrelated to oil and gas production were inappropriately capitalized to oil and gas properties, and certain operating expenses were inappropriately capitalized to oil and gas properties being amortized. These items resulted in errors in valuation of the full cost pool, oil and gas production expenses and general and administrative expenses.

- Invoices were not properly accrued resulting in the understatement of accounts payable and numerous other balance sheet and income statement accounts.

- As a result of previously discussed errors and an additional error related to the methods used in calculating depreciation, depletion and amortization, errors existed in our depreciation, depletion and amortization expense and our accumulated depreciation, depletion and amortization.

- As a result of previously discussed errors relating to oil and gas properties and hedge accounting, and errors relating to the treatment of deferred taxes, errors existed in our ceiling test calculations.

Although the items listed above comprise the most significant errors (by dollar amount), numerous other errors were identified and restatement adjustments made. The tables below present previously reported partners' equity, major restatement adjustments and restated partners' equity as well as previously reported loss, major restatement adjustments and restated net income (loss) as of and for the periods indicated (in thousands):

|  | Successor | Predecessor | |
|---|---|---|---|
|  | As of December 31 | | |
|  | 2007 | 2006 | 2005 |
| Partners' equity as previously reported | $228,760 | $51,091 | $69,547 |
| Effect of the Transfers | (9,500) | (8,000) | (2,000) |
| Reversal of hedge accounting | 1,224 | (2,389) | (8,177) |
| Accounting for formation of Quest Cherokee | (15,102) | (15,102) | (15,102) |
| Capitalization of costs in full cost pool | (24,007) | (12,671) | (5,388) |
| Recognition of costs in proper periods | (1,540) | (233) | (272) |
| Depreciation, depletion and amortization | 11,920 | 8,249 | 4,054 |
| Impairment of oil and gas properties | 30,719 | 30,719 | — |
| Other errors | (2,744) | (4,910) | (3,920) |
| Partners' equity as restated | $219,730 | $46,754 | $38,742 |

|  | Successor | Predecessor | | |
|---|---|---|---|---|
|  | November 15, 2007 to December 31, 2007 | January 1, 2007 to November 14 | Year Ended December 31 | |
|  | 2007 | 2007 | 2006 | 2005 |
| Net loss as previously reported | $(18,511) | $(19,191) | $(47,549) | $(25,192) |
| Effect of the Transfers | — | (1,500) | (6,000) | (2,000) |
| Reversal of hedge accounting | 1,627 | 73 | 53,387 | (42,854 |
| Accounting for formation of Quest Cherokee | — | — | — | (10,319) |
| Capitalization of costs in full cost pool | (1,839) | (9,497) | (7,283) | (5,388) |
| Recognition of costs in proper periods | — | (1,307) | 39 | (80) |
| Depreciation, depletion and amortization | 335 | 3,336 | 4,195 | 1,448 |
| Impairment of oil and gas properties | — | — | 30,719 | — |
| Other errors | (818) | (1,088) | 1,625 | (922) |

| | | | |
|---|---|---|---|
| Net income (loss) as restated | $(19,206) | $(29,174) | $29,133 | $(85,307) |

Reconciliations from amounts previously included in our consolidated financial statements to restated amounts on a financial statement line item basis are presented in Note 16 — Restatement in the notes to the accompanying consolidated financial statements.

Other Matters — In addition to the items for which we have restated our consolidated financial statements, the Oklahoma Department of Securities has filed a lawsuit alleging:

- The theft of approximately $1.0 million by David E. Grose, the former chief financial officer, and Brent Mueller, the former purchasing manager. The evidence indicates that this theft occurred in the third quarter of 2008 and was uncovered prior to the preparation of the financial statements for such period, and therefore did not result in a restatement.

- A kickback scheme involving David E. Grose and Brent Mueller, in which each received kickbacks totaling approximately $0.9 million from several related suppliers beginning in 2005.

128.    The Form 10-K also revealed that QELP had overstated its revenues by

$7.211 million for the period January 1, 2007 through November 14, 2007 and by $516

thousand for the period November 15, 2007 through December 31, 2007.

129.    The Form 10-K also revealed the true scope of the "material weaknesses"

in QELP's internal controls over financial reporting noted previously:

During management's review of our internal controls as of December 31, 2008, control deficiencies that constituted material weaknesses related to the following items were identified:

- We did not maintain an effective control environment. The control environment, which is the responsibility of senior management, sets the tone of the organization, influences the control consciousness of its people, and is the

foundation for all other components of internal control over financial reporting.

- We did not maintain effective monitoring controls to determine the adequacy of our internal control over financial reporting and related policies and procedures.

- We did not establish and maintain effective controls over certain of our period-end financial close and reporting processes, including the preparation and review of financial statements and schedules and journal entries.

- We did not establish and maintain effective controls to ensure the correct application of generally accepted accounting principles in the United States of America ("GAAP") related to derivative instruments.

- We did not establish and maintain effective controls to ensure completeness and accuracy of depreciation, depletion and amortization expense.

- We did not establish and maintain effective controls to ensure the accuracy and application of GAAP related to the capitalization of costs related to oil and gas properties and the required evaluation of impairment of such costs.

- We did not establish and maintain effective controls to adequately segregate the duties over cash management.

130.   On July 14, 2009, the Company filed its amended quarterly report on Form 10-Q/A for the quarter ended March 31, 2008, which included QELP's restated consolidated financial statements as of March 31, 2008 and for the three month period ended March 31, 2008 and QELP's Predecessor's restated carve out financial statements for the three month period ended March 31, 2007:

The tables below present previously reported partners' equity, major restatement adjustments and restated partners' equity as well as previously reported loss, major restatement adjustments and restated net loss as of and for the periods indicated (in thousands):

|                                                   | March 31, 2008 |
|---------------------------------------------------|---------------:|
| Partners' equity as previously reported           |   $  184,584   |
| Effect of the Transfers                           |        (9,500) |
| Reversal of hedge accounting                      |        (2,725) |
| Accounting for formation of Quest Cherokee        |       (15,102) |
| Capitalization of costs in full cost pool         |       (27,595) |
| Recognition of costs in proper periods            |          (957) |
| Depreciation, depletion and amortization          |         11,429 |
| Impairment of oil and gas properties              |         30,719 |
| Other errors                                      |          3,823 |
| Partners' equity as restated                      |   $    174,676 |

|                                                   | Three Months Ended March 31, | |
|                                                   |           2008 |          2007 |
|---------------------------------------------------|---------------:|--------------:|
| Net loss as previously reported                   |      $(17,346) |    $  (3,650) |
| Effect of the Transfers                           |             — |         (500) |
| Reversal of hedge accounting                      |       (19,196) |      (14,079) |
| Capitalization of costs in full cost pool         |        (3,659) |       (2,419) |
| Recognition of costs in proper periods            |            583 |         (244) |
| Stock-based compensation                          |          (431) |         (345) |
| Depreciation, depletion and amortization          |          (491) |         (480) |

| | | |
|---|---|---|
| Other errors(*) | (225) | (1,046) |
| Net loss as restated | $(40,765) | $(22,763) |

131.   The Company further disclosed:

This Amendment No. 1 to the Quarterly Report on Form 10-Q/A restates the Quarterly Report on Form 10-Q for the quarter ended March 31, 2008 in its entirety to reflect the effects of the restatement. However, the Company has not modified nor updated disclosures presented in the Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, except as required to reflect the effects of the matters discussed above. Accordingly, this Amendment No. 1 to the Quarterly Report on Form 10-Q/A does not reflect events occurring after the filing of the Quarterly Report on Form 10-Q for the quarter ended March 31, 2008, initially filed with the SEC on May 15, 2008, or modify or update those disclosures affected by subsequent events or discoveries. Therefore, this Amendment No. 1 to the Quarterly Report on Form 10-Q/A should be read in conjunction with the Company's 2008 Form 10-K and the other subsequent reports that the Company has filed with the Securities and Exchange Commission.

The Company has also restated the following items, which were impacted by the adjustments described above:

Part I

Item 1 — Financial Statements

Item 2 — Management's Discussion and Analysis of Financial Condition and Results of Operations

Item 3 — Quantitative and Qualitative Disclosures About Market Risk

Item 4(T) — Controls and Procedures

132.   On July 14, 2009 the Company also filed its amended quarterly report on Form 10-Q/A for the quarter ended June 30, 2008 which included QELP's restated consolidated financial statements as of June 30, 2008 and for the three and six month

periods ended June 30, 2008 and QELP's Predecessor's restated and reaudited carve out financial statements for the three and six month periods ended June 30, 2007:

133.    The tables below present previously reported partners' equity, major restatement adjustments and restated partners' equity as well as previously reported net income (loss), major restatement adjustments and restated net loss as of and for the periods indicated (in thousands):

|  | June 30, 2008 |
|---|---|
| Partners' equity as previously reported | $ 80,110 |
| Effect of the Transfers | (9,500) |
| Reversal of hedge accounting | 3,658 |
| Accounting for formation of Quest Cherokee | (15,102) |
| Capitalization of costs in full cost pool | (31,091) |
| Recognition of costs in proper periods | (2,656) |
| Depreciation, depletion and amortization | 11,000 |
| Impairment of oil and gas properties | 30,719 |
| Other errors | 5,136 |
| Partners' equity as restated | $ 72,274 |

|  | Three Months Ended June 30, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| Net income (loss) as previously reported | $  16,221 | $  (5,231) |
| Effect of the Transfers | — | (500) |
| Reversal of hedge accounting | (105,179) | 7,689 |
| Capitalization of costs in full cost pool | (3,425) | (3,028) |
| Recognition of costs in proper periods | (1,699) | (188) |
| Stock-based compensation | 446 | 104 |
| Depreciation, depletion and amortization | (429) | (175) |
| Other errors | 449 | 126 |
| Net loss as restated | $  (93,616) | $  (1,203) |

|  | Six Months Ended June 30, | |
| --- | --- | --- |
|  | 2008 | 2007 |
| Net loss as previously reported | $  (1,125) | $  (8,924) |
| Effect of the Transfers | — | (1,000) |
| Reversal of hedge accounting | (124,375) | (6,394) |
| Capitalization of costs in full cost pool | (7,084) | (5,447) |
| Recognition of costs in proper periods | (1,116) | (432) |
| Stock-based compensation | 15 | (241) |

| | | |
|---|---:|---:|
| Depreciation, depletion and amortization | (920) | (655) |
| Other errors | 224 | (916) |
| Net loss as restated | $  (134,381) | $(24,009) |

134.    The Company further disclosed:

This Amendment No. 1 to the Quarterly Report on Form 10-Q/A restates the Quarterly Report on Form 10-Q for the quarter ended June 30, 2008 in its entirety to reflect the effects of the restatement. However, the Company has not modified nor updated disclosures presented in the Quarterly Report on Form 10-Q for the quarter ended June 30, 2008, except as required to reflect the effects of the matters discussed above. Accordingly, this Amendment No. 1 to the Quarterly Report on Form 10-Q/A does not reflect events occurring after the filing of the Quarterly Report on Form 10-Q for the quarter ended June 30, 2008, initially filed with the SEC on August 12, 2008, or modify or update those disclosures affected by subsequent events or discoveries. Therefore, this Amendment No. 1 to the Quarterly Report on Form 10-Q/A should be read in conjunction with the Company's 2008 Form 10-K and the other subsequent reports that the Company has filed with the Securities and Exchange Commission.

The Company has also restated the following items, which were impacted by the adjustments described above:

Part I

Item 1 — Financial Statements

Item 2 — Management's Discussion and Analysis of Financial Condition and Results of Operations

Item 3 — Quantitative and Qualitative Disclosures About Market Risk

Item 4(T) — Controls and Procedures

135.    The Company further reported that it had restated its revenues for the first quarter ended March 31, 2008 to $35.890 million from $37.403 and for the second quarter ended June 30, 2008 to $31.360 million from $39.972 million.

I.    **Defendants' Violated GAAP and SEC Regulations by, Among Other Things, Failing to Disclose Related Party Transactions and Their Effect on the Company's Financial Statements**

136.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  Those principles are the official standards adopted by the American Institute of Certified Public Accountants ("AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board, and the Financial Accounting Standards Board ("FASB").

137.    GAAP and SEC regulations provide that a public company and its management must disclose related party transactions in quarterly and annual filings with the SEC.

138.    Statement of Financial Accounting Standards ("FAS") No. 57, Related Party Disclosures, provides guidance on the disclosure of transactions with related parties.  Examples of related party transactions include, among others, transactions between (1) an enterprise and its principal owners, management, or members of their immediate families, and (2) affiliates. *Id.*

139.    FAS No. 57 defines management of an enterprise as follows:

**Management.**  Persons who are responsible for achieving the objectives of the enterprise and who have the authority to establish policies and make decisions by which those objectives are to be pursued. Management normally includes members of the Board of Directors, the Chief Executive Officer, Chief Operating Officer, Vice Presidents in charge of principal business functions (such as the sales, administration, or finance), and other persons who perform similar policy making functions. Persons without formal titles also may be members of management.

140. FAS No. 57 provides that financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. The disclosures shall include:

    (a)    The nature of the relationship(s) involved;

    (b)    A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements.

    (c)    The dollar amounts of the transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period.

    (d)    Amounts due from or to related parties as of the date of each balance sheet presented and if not otherwise apparent the terms and manner of settlement.

*Id.*

141. For SEC Registrants, such as QELP, SEC Regulation S-X, Rules 4-09(k)(1) and (2) set forth the following additional requirements:

    *(k)*    Related Party Transactions, which affect the financial statements.

    (1)    Related Party Transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows.

142. SEC regulations also prescribe non-financial statement disclosure requirements with respect to related party transactions. SEC Regulation S-K (Reg. §229.404 Item 404) requires disclosure of certain relationships and related transactions in the non-financial-statement portions of Registration Statements filed under the 1933

Securities Act and Registration Statements, Annual Reports, Proxy Statements, and any other documents required to be filed under the 1934 Securities Act, as follows:

(a)    Transactions With Management and Others.    Describe briefly any transaction, or series of similar transactions, since the beginning of the Registrant's last fiscal year, or any currently proposed transaction, or series of similar transactions, to which the Registrant or any of its subsidiaries was or is to be a party, in which the amount involved exceeds $120,000.00 and in which any of the following persons had, or will have, a direct or indirect material interest, naming such person and indicating the person's relationship to the Registrant, the nature of such person's interest in the transaction(s), the amount of such transaction(s) and, where practicable, the amount of such person's interest in the transaction(s):

1.    Any director or executive officer of the Registrant.

\*\*\*

(c)    Indebtedness of Management.    If any of the following persons has been indebted to the Registrant or its subsidiaries at any time since the beginning of the Registrant's last fiscal year in an amount in excess of $120,000.00, indicate the name of such person, the nature of the person's relationship by reason of which such person's indebtedness is required to be described, the largest aggregate amount of indebtedness outstanding at any time during such period, the nature of the indebtedness and of the transaction in which it was incurred, the amount thereof outstanding as of the latest practicable date and the rate of interest paid or charged thereon:

(1)    Any director or executive officer of the Registrant;

\* \* \*

(4)    Any corporation or organization (other than the Registrant or a majority owned subsidiary of the Registrant) of which any of the persons specified in paragraphs (c)(1) or (2) is an executive officer or partner or is, directly or indirectly the beneficial owner of 10% or more of any class of equity securities.

SEC Regulation S-K (REG. §229.404 Item 404)(c)).

143.    In short, FAS 57 sets forth the GAAP requirements for related party transaction disclosures. Paragraph 2 of FAS 57 provides that a public company's

"[f]inancial statements shall include disclosures of material related party transactions."
"Related party transactions" include those between "an enterprise and its principal
owners, management, or members of their immediate families" and those between a
company and its "affiliates." (FAS 57, ¶1). "Affiliate" includes any company that is under
common control of management with the public company. (*Id.*, ¶24(a)-(b).) Disclosures
of related party transactions shall include (a) the nature of the relationship involved, (b)
a description of the transactions for each period for which income statements are
presented and such other information necessary to an understanding of the effects of
the transactions on the financial statements, (c) the dollar amount of transactions for
each of the periods for which income statements are presented, and (d) amounts due
from or to related parties as of the date of each balance sheet presented and, if not
otherwise apparent, the terms and manner of settlement. (*Id.* ¶2.).

144.    Under FAS 57, each of QELP's quarterly reports on Forms 10-Q and
annual report on Form 10-K should have disclosed the details of QELP's related party
transactions with Cash, Grose and their affiliates, but did not.

145.    In addition, as set forth above, SEC regulations require further disclosures
of related party transactions.  Among other things, Part III of Form 10-K requires
disclosure of "Certain Relationships and Related Transactions," specifically including
disclosures prescribed by Item 404 of SEC Regulation S-K. Item 404(a) of Regulation
S-K requires a description of any transactions exceeding $120,000 (the threshold was
$60,000 for filings made before December 2006) in which the public company is a party
and in which any director, executive officer or member of their immediate families has a
direct or indirect material interest. Item 404(a) requires disclosure of the person and the

person's relationship to the public company, the nature of the person's interest in the transaction and, where practicable, the amount of the person's interest in the transaction.

146. Under GAAP and SEC regulations, all of the transactions described previously – in which Cash and Grose unquestionably had direct or indirect material interests – were required to be disclosed in QELP's Form 10-K and Form-Q filings for each relevant year, and in its financial statements and Registration Statements, but were not.

147. Defendants also failed to disclose the effects of these related party transactions on QELP's financial statements.

148. Given these, and other, accounting irregularities alleged herein, the Company announced financial results that were in violation of GAAP, and the following additional fundamental accounting principles:

    (a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. 28, ¶ 10);

    (b)    The principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions (FASB Statement of Concepts No. 1, ¶ 34);

    (c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶ 40);

    (d)    The principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are

commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶ 42);

(e)  The principles that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.   To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for the accountability to prospective investors and the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(f)  The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)  The principle of completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶ 79); and

(h)  The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95, 97).

**J.   Murrell Hall Violated GAAS In Recklessly Conducting it Audits of QELP's Financial Statements and Falsely Certifying that Such Financial Statements Complied with GAAP**

149.   GAAS are ten auditing standards, developed by the AICPA consisting of general standards, standards of field work, and standards of reporting, along with interpretations. AICPA Codification of Statements on Auditing Standards AU 150.02.

150.   Rule 202, Compliance With Standards, of the AICPA Code of Professional Conduct, requires an AICPA member who performs an audit (the auditor) to comply with standards promulgated by the Auditing Standards Board ("ASB"). The ASB develops and issues standards in the form of Statements of Accounting Standards ("SAS") through a due process that includes deliberation in meetings open to the public, public

exposure of proposed SASs, and a formal vote. The SASs are codified within the framework of the 10 standards. AU Section 150.03.

151.   The nature of the 10 standards and the SASs requires the auditor to exercise professional judgment in applying them. Materiality and audit risk also underlie the application of the 10 standards and the SASs, particularly those related to field work and reporting. When, in rare circumstances, the auditor departs from a presumptively mandatory requirement, the auditor must document in the working papers his or her justification for the departure and how the alternative procedures performed in the circumstances were sufficient to achieve the objectives of the presumptively mandatory requirement. AU Section 150.04.

152.   Interpretive publications consist of auditing interpretations of the SASs, appendixes to the SASs, auditing guidance included in AICPA Audit and Accounting Guides, and AICPA auditing Statements of Position. Interpretive publications are not auditing standards. Interpretive publications are recommendations on the application of the SASs in specific circumstances, including engagements for entities in specialized industries. An interpretive publication is issued under the authority of the ASB after all ASB members have been provided an opportunity to consider and comment on whether the proposed interpretive publication is consistent with the SASs. AU Section 150.05.

153.   The auditor should be aware of and consider interpretive publications applicable to his or her audit. If the auditor does not apply the auditing guidance included in an applicable interpretive publication, the auditor should be prepared to explain how he or she complied with the SAS provisions addressed by such auditing guidance. AU Section 150.06.

154.    In performing its audit of QELP and QELP's Predecessor's financial statements, Defendant Murrell Hall was required by GAAS, as stated in AU §380, to discuss, among others, the following matters with QELP's Audit Committee:

      (a)    Any significant unusual transactions; and

      (b)    Any material financial statement misstatement.

155.    Murrell Hall issued false and misleading unqualified audit reports and opinions on QELP's and QELP's Predecessor's financial statements, which stated that QELP's financial statements were presented in conformity with GAAP and that Murrell Hall's audits were performed in accordance with GAAS.  These audit reports were included in QELP's Registration Statement filed with the SEC on Forms S-A/1 and S-1 and in QELP's annual report for the year ending December 31, 2007.

156.    In issuing its unqualified audit opinions regarding QELP's financial statements, Murrell Hall knew or recklessly disregarded that such financial statements violated GAAP and were materially false and misleading in that they misrepresented QELP's financial results and condition and failed to disclose material related party transactions.

157.    Appropriate auditing procedures for identifying related parties and the related disclosure requirements are contained in SAS No. 45, Related Parties (AU §334), and Financial Accounting Standard ("FAS") No. 57, Related Party Disclosures. In addition, Related Party issues are discussed in Practice Alert No. 95-3, Auditing Related Parties and Related Party Transactions.

158.    SAS No. 22, Planning and Supervision, (AICPA, Professional Standards, vol. 1, AU §311.03) provides that in planning the audit, the auditor should consider, among other matters, conditions that may require extension or modification of audit

tests, such as the risk of material error or fraud or the existence of related party transactions. Audit risk consists of (a) the risk (consisting of inherent risk and control risk) that the balance or class and related assertions contain misstatements (whether caused by error or fraud) that could be material to the financial statements when aggregated with misstatements in other balances or classes and (b) the risk (detection risk) that the auditor will not detect such misstatements.

159. SAS No. 45 (AU 334) provides guidance on procedures that should be considered by the auditor when he is performing an audit of financial statements in accordance with GAAS to identify related party relationships and transactions and to satisfy himself concerning the required financial statement accounting and disclosure.

160. The auditing interpretation to SAS No. 45 states that the "auditor's procedures should be sufficient to provide reasonable assurance that related party transactions are adequately disclosed and that identified related party transactions do not contain material misstatements that, when aggregated with misstatements in other balances or classes of transactions, could be material to the financial statements taken as a whole. . . .The risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." Moreover, when there are significant transactions between related parties and the scope of the audit does not cover the records of the other significant parties to the transaction (for example, an entity owned by the President of the Company that provides management services to the Company, but is not subject to audit), there is increased audit risk. *Accounting and*

*Auditing for Related Parties and Related Party Transactions, A Tool Kit for Accountants and Auditors,* prepared by the staff of the AICPA.

161.    SAS No. 45 (AU §334) gives examples of transactions that because of their nature may be indicative of the existence of related parties:

    a.    Borrowing or lending on an interest-free basis or at a rate of interest significantly above or below market rates prevailing at the time of the transaction.

<div align="center">***</div>

    d.    Making loans with no scheduled terms for when or how the funds will be repaid.

162.    AU §334 includes the following, not all-inclusive, specific audit procedures to help determine the existence of other related parties:

    a.    Evaluate the company's procedures for identifying and properly accounting for related party transactions.

<div align="center">***</div>

    c.    Review filings by the reporting entity with the Securities and Exchange Commission, and other regulatory agencies for the names of related parties and for other businesses in which officers and directors occupy directorship or management positions.

<div align="center">***</div>

    h.    Review material investment transactions during the period under audit to determine whether the nature and extent of investments during the period create related parties.

163.    Paragraph .08 of SAS No. 45, Related Parties (AU §334), provides guidance for both "identifying material transactions with parties known to be related and for identifying material transactions that may be indicative of the existence of previously undetermined relationships."  Those suggested procedures include:

    •    Review the minutes of meetings of the Board of Directors and Executive or Operating Committees for information

about material transactions authorized or discussed at their meetings;

- Review proxy and other material filed with the Securities and Exchange Commission and comparable data filed with other regulatory agencies for information about material transactions with related parties;

- Review the extent and nature of business transacted with major customers, suppliers, borrowers, and lenders for indications of previously undisclosed relationships;

- Consider whether transactions are occurring, that are not being given accounting recognition, such as receiving or providing accounting, management or other services, at no charge or a major stockholder absorbing corporate expenses;

- Review accounting records for large, unusual or non-recurring transactions or balances, paying particular attention to transactions recognized at or near the end of the reporting period.

164.    SAS No. 45, Related Parties (AU §334.09), states that once related parties are identified the auditor should apply the procedures he considers necessary to obtain satisfaction concerning the purpose, nature, and extent of the transactions and their effect on the financial statements.  These auditing procedures should be directed toward obtaining and evaluating sufficient appropriate audit evidence and should extend beyond inquiry of management. *Id*.  Procedures that should be considered include the following:

- Obtain an understanding of the business purpose of the transaction;

- Examine invoices, executed copies of agreements, contracts, and other pertinent documents, such as receiving reports and shipping documents;

- Determine whether the transaction has been approved by the Board of Directors or other appropriate officials;

72

- Test for reasonableness the compilation of amounts to be disclosed, or considered for disclosure, in the financial statements;

*Id.*

165.  SAS No. 45 also states that when necessary to fully understand a particular transaction, the auditor should consider the following procedures:

- Confirm transaction amount and terms, including guarantees and other significant data with the other party or parties to the transaction;

- Inspect evidence in possession of the other party or parties to the transaction;

- Confirm or discuss significant information with intermediaries such as banks, guarantors, agents or attorneys to obtain a better understanding of the transaction

- Refer to financial publications, trade journals, credit agencies, and other information sources when there is a reason to believe that unfamiliar customers, suppliers, or other business enterprises with which material amounts of business have been transacted may lack substance.

166.  The procedures set forth in SAS No. 45 (AU 334) "should not be considered all-inclusive." *Id.*

167.  Had Murrell Hall conducted even a minimum of the audit procedures required or suggested for identifying related party transactions and properly disclosing same in QELP's financial statements, it would have discovered the related party transactions between Cash, Grose, Rockport Energy and QELP and the nature of same; and would have required their disclosure in the financial statements or withheld its unqualified opinions on QELP's and its Predecessor's financial statements.  But it did not.

168.    Instead in certifying QELP's financial statements, Murrell Hall falsely and recklessly represented that such financial statements presented fairly QELP's financial position in accordance with GAAP and that its audit was conducted in accordance with GAAS.  These statements were materially false and misleading in that the financial statements did not comply with GAAP and the audits conducted by Murrell Hall were knowingly or recklessly not performed in accordance with GAAS in the following respects:

a.    Murrell Hall violated GAAS Standard of Reporting No. 1 that requires the audit report to state whether the financial statements are presented in accordance with GAAP.  Murrell Hall's opinion falsely represented that QELP's financial statements were presented in conformity with GAAP when they were not for the reasons herein alleged;

b.    Murrell Hall violated GAAS Standard of Field Work No. 1 by, among other things, failing to adequately plan its audit and properly supervise the work of assistants and to establish and carry out procedures reasonably designed to search for and detect the existence of errors and irregularities which would have a material effect upon the financial statements;

c.    Murrell Hall violated GAAS General Standard No. 3 that requires that due professional care must be exercised by the auditor in the performance of the audit and the preparation of the audit report;

d.    Murrell Hall violated GAAS Standard of Field Work No. 2 which requires the auditor to make a proper study of existing internal controls, including accounting, financial and managerial controls, to assess the risk of material misstatement of the financial statements whether due to error or fraud, and design the nature, timing, and extent of further audit procedures. AU §150.02.  In all audits, the auditor should perform procedures to obtain a sufficient understanding of three elements of an entity's internal control structure:  the control environment, the accounting system, and control procedures. AU §319.02. The control environment, which includes management's integrity and ethical values, is the foundation of internal control and provides discipline, structure and sets the tone of an organization.  After obtaining an understanding of an entity's internal control structure, the auditor assesses the entity's control risk.  AU §319.02.  Control risk is the risk that a

material misstatement in an assertion by management contained in a company's financial statements will not be prevented or detected on a timely basis by an entity's internal control structure policies or procedures.    AU §319.29.    The ultimate purpose of assessing control risk is to aid the auditor in evaluating the risk that material misstatements exist in the financial statements.  AU §319.61.  The failure of Murrell Hall to properly evaluate QELP's internal control procedures associated with internal control over financial reporting, controls over the period-end close and reporting processes, control environment and control over cash management, among others, was a violation of GAAS;

e.    Murrell Hall violated GAAS Standard of Field Work No. 3, which requires sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statement under audit.  Murrell Hall knew or recklessly disregarded that it did not obtain sufficient appropriate audit evidence of QELP's related party transactions with Rockport Energy and the effect those transactions had on QELP's financial statements.

## K.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS PROXIMATELY CAUSED ECONOMIC LOSS TO PURCHASERS OF QELP COMMON UNITS

169.    During the Class Period, as alleged herein, Defendants made materially false and misleading statements concerning QELP's financial results and condition, QELP's related party transactions and their effects on the Company's financial statements, and the effectiveness of the Company's control over financial reporting.

170.    During the Class Period, Defendants maintained the artificial inflation in QELP's stock prices by continuing to make false and misleading statements regarding QELP's financial results and condition, QELP's related party transactions and their effects on the Company's financial statements, and the effectiveness of the Company's control over financial reporting.

171.    The Defendants' misstatements and omissions, as alleged herein, created the false impression, among other things, that QELP had more cash on hand, net

income and members' equity than it actually had; and concealed the Company's ineffective controls over financial reporting and accounting and the illegal related party transactions alleged herein that if revealed would reflect negatively on the Company and its management.  But for Defendants' material misstatements and omissions, as alleged herein, QELP's common units would not have traded at the elevated levels that they did during the Class Period.

172.    The artificial inflation in the price of QELP's common units was eliminated beginning August 24, 2008 when the Company disclosed that it had discovered approximately $10 million in questionable transfers from QELP to a bank account controlled by Cash.  As a direct result of this disclosure, the price of QELP shares fell $3.22 per share or nearly 23% to $11.49 per share on heavy trading volume.

173.    The price of QELP units continued to decline as the market began to absorb the negative news and as more news concerning the Company's wrongful conduct came out.

174.    Then, on January 28, 2009, QELP announced that its General Partner's Board of Directors had decided to suspend distributions of QELP common units.  On this news the price of QELP shares fell $1.97, or 48%, that same day on heavy trading volume.

175.    The foregoing allegations demonstrate that Plaintiffs' damages were caused by the material misstatements and omissions as alleged herein, and negate any negative inference that Plaintiffs' losses were the result of general market conditions or other factors wholly unrelated to the false and misleading information complained of herein. Upon further investigation and expert analysis, Plaintiffs may assert that there

were additional inflationary or corrective events that caused or contributed to the damages Plaintiffs incurred.

### L.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

176.    At all relevant times, the market for QELP securities was an efficient market for the following reasons, among others:

(a)    QELP securities met the requirements for listing, and were listed and actively traded on the NYSE Arca, a highly efficient and automated market;

(b)    As a regulated issuer, QELP filed periodic public reports with the SEC and the NYSE;

(c)    QELP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    QELP was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

177.    As a result of the foregoing, the market for QELP securities promptly digested current information regarding QELP from all publicly available sources and reflected such information in QELP's common unit price.  Under these circumstances, all purchasers of QELP common units during the Class Period suffered similar injury through their purchase of QELP securities at artificially inflated prices, and a presumption of reliance applies.

### M.    NO SAFE HARBOR

178.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Consolidated Complaint. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of QELP who knew that those statements were false when made.

### N.    SCIENTER ALLEGATIONS

179.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding QELP, their control over, and/or receipt and/or modification of QELP's allegedly materially misleading statements and/or their

78

associations with the Company which made them privy to confidential proprietary information concerning QELP, participated in the fraudulent scheme alleged herein.

180.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Consolidated Complaint could not have been perpetrated over the substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company.

### FIRST CLAIM

**Violation of Section 11 of the Securities Act Against
Defendants Quest Energy Partners LP, Quest Energy
GP LLC, Jerry Cash and David E. Grose**

181.    Plaintiffs repeat and reallege ¶¶1, 13-16, 17-38, 72-90, 119-148, 169-178 contained above as if fully set forth herein.  This claim is based solely on negligent conduct and does not sound in fraud.

182.    This claim is brought against Defendants QELP, Quest Energy GP, Cash and Grose ("First Claim Defendants").

183.    This claim is brought by Plaintiffs on their own behalf and on behalf of other members of the Class who acquired QELP common units pursuant to or traceable to the Company's Registration Statement and Prospectus issued in connection with the IPO.  Each Class Member acquired his, her, or its shares pursuant to and/or traceable to the Registration Statement and Prospectus.  QELP is the issuer of the securities through the Registration Statement and Prospectus.  Cash and Grose are signatories of the Registration Statement which included a Prospectus.

184.    On or about October 31, 2007, the First Claim Defendants issued, caused the issuance, and/or signed Amendment No. 5 to QELP's Form S-1 Registration

Statement that was filed with the SEC in connection with QELP's IPO.  The Registration Statement, when effective, provided, inter alia, for the sale of 9,100,000 common units of QELP at $18.00 per unit.  Included in the Registration Statement were purported financial information about QELP as well as information about related-party transactions.

185.   The Registration Statement contained untrue statements of material fact and/or omitted to state material facts necessary to make statements therein not misleading.

186.   In particular, the Registration Statement contained financial statements for QELP and QELP's Predecessor entity, as detailed in ¶83 above, along with an unqualified audit opinion on those financial statements issued by QELP's auditor Murrell Hall.

187.   The Registration Statement also did not disclose the related party transactions between Cash, Grose and Rockport Energy and their effects on QELP's financial statements.

188.   The above material statements of fact contained in the Registration Statement were untrue for among other reasons:

       (a)     QELP's financial statements included in the Registration Statement were false;

       (b)      The Registration Statement did not properly disclose the transactions involving Cash, Grose and Rockport Energy;

       (c)     the financial statements were not presented in accordance with GAAP; and

       (d)     the financial statements were not audited in accordance with GAAS.

189.  On or about January 2, 2009, QELP disclosed that certain of its and its Predecessor's financial statements could not be relied upon.

190.  Beginning on or about June 16, 2009, with the filing of its Form 10-K, QELP restated certain of its financial statements.  QELP restated, among other things, and QELP's Predecessor's audited consolidated financial statements as of and for the years ended December 31, 2005 and 2006.

191.  The false statements, misrepresentations and omissions identified above caused the market price of QELP's common units to be artificially inflated at the time of the IPO.

192.  QELP is the issuer of the stock sold via the Registration Statement and Prospectus.  As issuer of securities, the Company is strictly liable to Plaintiffs and the Class for the material misstatements and omissions therein.  The other First Claim Defendants owed to the purchasers of the common units obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there were no omissions of material facts required to be stated in order to make the statements contained therein not misleading.

193.  None of the First Claim Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true or that there were no omissions of material facts necessary to make the statements made therein not misleading.

194.   The First Claim Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the facts set forth above.  By reason of the conduct alleged herein, each Defendant violated Section 11 of the Securities Act.

195.   At the times they obtained their common units of QELP, Plaintiffs and other members of the Class did so without knowledge of the facts concerning the misstatements and omissions alleged herein.  As a direct and proximate result of the wrongdoing of the Defendants named in this count, Plaintiffs and the other members of the Class have suffered substantial damages.

196.   This claim is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Registration Statement and Prospectus.

197.   By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages, under Section 11 of the Securities Act, as measured by the provisions of Section 11(e), from the First Claim Defendants and each of them, jointly and severally.

## SECOND CLAIM

### Violations of Section 15 of the Securities Act
### Against Quest Resource Corporation
### Quest Energy GP, Cash and Grose

198.    Plaintiffs repeat and reallege ¶¶1, 13-16, 17-38, 72-90, 119-148, 169-178, 181-197 contained above as if fully set forth herein.  This claim is not based on and does not sound in fraud, but is based solely on negligent conduct.

199.    This claim is asserted against Cash, Grose, Quest Resource, and Quest Energy GP, each of whom was a control person or entity of QELP during the relevant time period (the "Second Claim Defendants").

200.    For the reasons set forth above in the First Claim, the First Claim Defendants are liable to the Plaintiffs and the other members of the Class who purchased QELP common units in the IPO without knowledge of the untrue statements and omissions of material fact contained in the Registration Statement and Prospectus, pursuant to Section 11 of the Securities Act, and, as a direct and proximate result of these Defendants' wrongdoing, were damaged thereby.

201.    The Second Claim Defendants were control persons or entities of QELP by virtue of, among other things, ownership and control of the Company and their positions as senior officers and/or directors of the Company.  They were in positions to control and did control, the false and incomplete statements and omissions contained in the Registration Statement and Prospectus.  These Defendants had the power and authority to cause the issuer to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading statements and omissions in the Registration Statement.

202.    None of the Second Claim Defendants made reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

203.    This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after QELP's common units were sold to the Class in connection with the IPO.

204.    By reason of the misconduct alleged herein, for which QELP is primarily liable, as set forth above, the Second Claim Defendants are jointly and severally liable with and to the same extent as the First Claim Defendants pursuant to Section 15 of the Securities Act.

## THIRD CLAIM

### Against All Defendants for Violations of
### Section 10(b) of the Exchange Act and SEC Rule 10b-5

205.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

206.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase QELP common units at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

207.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for QELP securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.    All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons or entities as alleged below.

208.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, financial condition and results, operations, future prospects and related party transactions of QELP as specified herein.

209.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of QELP's value and financial condition, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about QELP, its business operations, financial condition and related party transactions in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of QELP securities during the Class Period.

210.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing QELP's operating condition and related party transactions from the investing public and supporting the artificially inflated price of its securities.   As demonstrated by Defendants' misstatements of the Company's business, operations, earnings and related party transactions throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

211.   As a result of the dissemination of the materially false and misleading statements and failure to disclose material facts, as set forth above, the market price of QELP securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of QELP publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity and efficiency of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired QELP securities during the Class Period at artificially inflated prices and were damaged thereby.

86

212.   At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding QELP's financial condition and results and related party transactions which were not disclosed by Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their QELP securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

213.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

214.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## FOURTH CLAIM

### Against the Individual Defendants, Quest Resource and Quest Energy GP for Violations of Section 20(a) of the Exchange Act

215.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

216.   Defendants Cash, Grose, Lawler, Pitmann, Stansberry, Quest Resource and Quest Energy GP acted as controlling persons or entities of QELP within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public,

these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. These Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

217.   In particular, these Defendants, and especially Cash, Grose, Lawler, Quest Energy GP and Quest Resource, had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

218.   As set forth above, QELP, Cash, Grose, Quest Resource, Quest Energy GP, Lawler, Pittman and Stansberry each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Consolidated Complaint. By virtue of their positions as controlling persons or entities, Cash, Grose, Quest Resource, Quest Energy GP, Lawler, Pittman and Stansberry are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period at artificially inflated prices.

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

1.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiff and certifying Plaintiffs as class

representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

2.    Finding that Defendants violated the federal securities laws by reason of their conduct alleged herein;

3.    Awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

4.    Awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

5.    Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: November 10, 2009

<div style="margin-left:40%">

Respectfully Submitted,

s/William B. Federman
Bar Number: 2853
Attorney for Plaintiffs
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Phone: (405) 235-1560
Fax: (405) 239-2112
E-mail: wbf@federmanlaw.com
Lead Counsel for Lead Plaintiff

Jeffrey S. Abraham
Lawrence D. Levit
ABRAHAM FRUCHTER & TWERSKY, LLP
One Penn Plaza, Suite 2805
New York, NY  10119
Phone: (212) 270-5050
Fax: (212) 279-3655
E-mail: jabraham@aftlaw.com
Counsel for Plaintiffs

</div>

89

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2009 a true and correct copy of the above and foregoing was served by Electronic Filing System, to all counsel of record.

<u>s/William B. Federman</u>