UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| MICHAEL FRIEDMAN, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | § § § § | |
| Plaintiff, | § § § | |
| v. | § § | CASE NO. 08-CV-00936-M |
| QUEST ENERGY PARTNERS L.P.; QUEST ENERGY GP LLC; QUEST RESOURCE CORPORATION; JERRY CASH; DAVID E. GROSE; DAVID C. LAWLER; GARY PITTMAN; MARK STANSBERRY; MURRELL, HALL, McINTOSH & CO. PLLP; AND EIDE BAILLY LLP, | § § § § § § § § § § | |
| Defendants. | § | |

**MOTION OF DEFENDANTS QUEST ENERGY PARTNERS L.P.,
QUEST ENERGY GP LLC, GARY PITTMAN, AND MARK STANSBERRY TO
DISMISS THE CONSOLIDATED COMPLAINT OF QUEST ENERGY
PARTNERS LP LEAD PLAINTIFF GROUP AND BRIEF IN SUPPORT**

Robert S. Harrell
Anne M. Rodgers
FULBRIGHT & JAWORSKI L.L.P.
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Telecopier: (713) 651-5246
rharrell@fulbright.com
arodgers@fulbright.com

Eric S. Eissenstat, OBA #10282
FELLERS, SNIDER, BLANKENSHIP,
  BAILEY & TIPPENS
100 North Broadway, Suite 1700
Oklahoma City, Oklahoma 73102
Telephone: (405) 232-0621
Telecopier: (405) 232-9659
eeissenstat@fellerssnider.com

*Attorneys for Defendants Quest Energy Partners L.P.,
Quest Energy GP LLC, Gary Pittman, and Mark Stansberry*

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT .................................................................. 1

FACTUAL BACKGROUND ................................................................... 3

    1.    The Quest Defendants .................................................. 3

        A.    Quest Resource .................................................. 3

        B.    QELP, Gary Pittman, And Mark Stansberry ..................................... 3

    2.    The Thefts From The Quest Entities ............................................ 5

    3.    The Thefts Come To Light; QELP And Its Board Respond ........................ 6

    4.    Quest Resource Absorbs The Loss From The Thefts................................ 7

ARGUMENT & AUTHORITIES ............................................................. 8

    1.    Plaintiffs Have Pleaded Merely Conclusory Allegations And Thus Have Not Met The Standards To Survive A Motion To Dismiss ............... 8

    2.    Plaintiffs' Claims Under The Securities Exchange Act Of 1934 Should Be Dismissed For Failure To State A Claim ................................... 9

        A.    The PSLRA And Rule 9(b) Create A Heightened Pleading Standard For Claims Under Section 10(b) ........................................ 9

        B.    Plaintiffs' Claim Is At Most An Artfully Pleaded Breach-of-Fiduciary-Duty Claim And Therefore Should Be Dismissed ......... 10

        C.    Plaintiffs Have Failed To Plead The Required Element Of Materiality .................................................................. 12

        D.    Plaintiffs Fail To Allege Scienter ................................................ 12

        E.    Plaintiffs Cannot Impute Cash's And Grose's Scienter To The Quest Energy Defendants ............................................... 15

        F.    Plaintiffs Have Not Pleaded The Element Of Reliance As Required For Their Section 10(b) Claim ........................................ 17

        G.    Plaintiffs' Control Person Claim Under Section 20(a) Fails As A Matter Of Law .................................................................. 19

-i-

**TABLE OF CONTENTS**
(continued)

Page

3.    Plaintiffs Fail To State A Claim Under The Securities Act Of 1933 .........21

    A.    Plaintiffs Fail To Plead The Required Element Of Materiality ......21

    B.    Plaintiffs' Complaint Reveals That The Due Diligence Defense Protects QEGP From Liability Under Section 11 Of The Securities Act Of 1933 ...........................21

    C.    Plaintiffs Have Not Pleaded Proper Control Person Liability Against QEGP Under Section 15 Of The Securities Act ................24

4.    No Amount Of Repleading Will Resolve The Complaint's Shortcomings .............................25

CONCLUSION...................................................25

CERTIFICATE OF SERVICE ...........................27

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. Kinder-Morgan, Inc.,*
    340 F.3d 1083 (10th Cir. 2003) ........................................................9, 12, 13, 16, 19

*Aetna Cas. and Sur. Co. v. Leahey Const. Co.,*
    219 F.3d 519 (6th Cir. 2000) ................................................................................. 16

*Affiliated Ute Citizens v. United States,*
    406 U.S. 128 (1972)................................................................................................ 18

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)......................................................................................... 8, 9

*Baena v. KPMG LLP,*
    453 F.3d 1 (1st Cir. 2006) ..................................................................................... 16

*Beck v. Deloitte & Touche,*
    144 F.3d 732 (11th Cir. 1998) .............................................................................. 17

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).............................................................................................. 8, 9

*In re Cabletron Sys.,*
    311 F.3d 11 (1st Cir. 2002).................................................................................... 13

*In re Cendant Corp. Sec. Litig.,*
    109 F. Supp. 2d 225 (D.N.J. 2000)....................................................................... 16

*City of Philadelphia v. Fleming Cos., Inc.,*
    264 F.3d 1245 (10th Cir. 2001) .............................................. 12, 13, 14, 15, 19, 21

*In re Craftmatic Sec. Litig.,*
    890 F.2d 628 (3d Cir. 1989) ................................................................................. 11

*In re Crazy Eddie Sec. Litig.,*
    802 F. Supp. 804 (E.D.N.Y. 1992) ....................................................................... 16

*Dennis v. General Imaging, Inc.,*
    918 F.2d 496 (5th Cir. 1990) ................................................................................ 20

*In re Digital Island Sec. Litig.,*
    223 F. Supp. 2d 546 (D. Del. 2002), *aff'd,* 357 F.3d 322 (3d Cir. 2004)............... 20

*Escott v. BarChris Constr. Co.*,
    283 F. Supp. 643 (S.D.N.Y. 1968) ............................................................... 23

*In re Fuzion Tech. Group, Inc.*,
    332 B.R. 225 (Bankr. S.D. Fla. 2005) ......................................................... 17

*GFF Corp. v. Associated Wholesale Grocers*,
    130 F.3d 1381 (10th Cir. 1997) ..................................................................... 3

*Greenapple v. Detroit Edison Co.*,
    618 F.2d 198 (2d Cir. 1980) ....................................................................... 21

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ............................................................ 21, 25

*Gruber v. Price Waterhouse*,
    776 F. Supp. 1044 (E.D. Pa. 1991) ............................................................ 18

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................... 22

*In re Initial Public Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006) ......................................................................... 18

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000) ............................................................ 17, 18

*Kas v. Financial Gen. Bankshares, Inc.*,
    796 F.2d 508 (D.C. Cir. 1986).............................................................. 10, 11

*Krim v. BancTexas Group, Inc.*,
    989 F.2d 1435 (5th Cir. 1993) .................................................................... 12

*Lillard v. Stockton*,
    267 F. Supp. 2d 1081 (N.D. Okla. 2003)................................................... 14

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996) ...................................................................... 25

*Lucia v. Prospect St. High Income Portfolio, Inc.*,
    36 F.3d 170 (1st Cir. 1994)......................................................................... 21

*Maher v. Durango Metals, Inc.*,
    144 F.3d 1302 (10th Cir. 1998) .................................................................. 19

*Miller v. Shell Oil Co.,*
    345 F.2d 891 (10th Cir. 1965) ............................................................... 22

*Mortensen v. AmeriCredit Corp.,*
    123 F. Supp. 2d 1018 (N.D. Tex.), *aff'd*, 240 F.3d 1073 (5th Cir. 2000) .............. 15

*Panter v. Marshall Field & Co.,*
    646 F.2d 271 (7th Cir. 1981) ............................................................... 11

*In re Rospatch Sec. Litig.,*
    760 F. Supp. 1239 (W.D. Mich. 1991) ..................................................... 20

*Santa Fe Indus., Inc. v. Green,*
    430 U.S. 462 (1977)..................................................................... 10, 11

*Shalaha v. Guernsey Mem'l Hosp.,*
    514 U.S. 87 (1995)........................................................................ 15

*Shaw v. Digital Equipment Corp.,*
    82 F. 3d 1194 (1st Cir. 1996)............................................................... 21

*Sheldon v. Vermonty,*
    31 F. Supp. 2d 1287 (D. Kan. 1998) ...................................................... 14

*Tal v. Hogan,*
    453 F.3d 1244 (10th Cir. 2006) ............................................................. 3

*Tellabs, Inc. v. Maker Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)....................................................................... 13

*In re Vantive Corp. Sec. Litig.,*
    283 F.3d 1079 (9th Cir. 2002) ............................................................. 13

*In re Williams Sec. Litig. WCG Subclass,*
    558 F.3d 1130 (10th Cir. 2009) ............................................................. 9

*In re WorldCom, Inc. Sec. Litig.,*
    346 F. Supp. 2d 628 (S.D.N.Y 2004) ..................................................... 23

## RULES AND STATUTES

15 U.S.C. § 77k............................................................................. 22, 24

15 U.S.C. § 77k(a)(4)........................................................................ 22

15 U.S.C. § 77k(b)(3) ....................................................................... 22

15 U.S.C. § 77k(b)(3)(C) ..................................................................... 24

15 U.S.C. § 77k(c) .............................................................................. 22

15 U.S.C. § 77o ................................................................................. 24

15 U.S.C. § 78u-4(b)(2) ...................................................................... 13

15 U.S.C. § 78u-4(b)(3) ...................................................................... 10

Fed. R. Civ. P. 9(b) .................................................................. 1, 2, 9, 18

Fed. R. Civ. P. 10(c) ............................................................................. 1

Fed. R. Civ. P. 12(b) ................................................................ 1, 3, 8, 22

Fed. R. Evid. 201(f) .............................................................................. 3

Defendants Quest Energy Partners L.P. ("QELP"), Quest Energy GP LLC ("QEGP"), Gary Pittman, and Mark Stansberry (collectively the "Quest Energy defendants") move to dismiss the Consolidated Complaint of Quest Energy Partners LP Lead Plaintiff Group ("CC") under the Private Securities Litigation Reform Act ("PSLRA") and Rules 12(b) and 9(b) of the Federal Rules of Civil Procedure.[1]

## SUMMARY OF ARGUMENT

In mid-2004, defendant Jerry Cash, who was the Chief Executive Officer of Quest Resource, conceived and began to execute a check-kiting scheme he would use to embezzle money from a number of Quest-related entities for his personal benefit. By hiring and enlisting the expertise of defendant David Grose as Chief Financial Officer, the two men were able to keep the scheme hidden for years. By the end of 2006, Cash had stolen approximately $8 million from the Quest-related entities; by late-2007, that number was up to $10 million.

In November 2007, Quest Resource (with Cash at the helm) formed QELP and sold QELP partnership units in an initial public offering ("IPO"). Defendant QEGP was also formed to be QELP's general partner. Quest Resource's outside auditors, Murrell, Hall, McIntosh & Co. ("Murrell Hall"), certified the financials that were incorporated in the Registration Statement and Prospectus for the IPO. Cash and Grose did not disclose

---

[1] Pursuant to Fed. R. Civ. P. 10(c), The Quest Energy defendants also adopt and incorporate by reference Defendants' David C. Lawler and Quest Resource Corporation's Opening Motion to Dismiss the Consolidated Complaint and Brief in Support and supporting Appendix, Docket Entries 159, 160.

their $10 million theft before or during the IPO. Nor did and Murrell Hall uncover the theft.

Gary Pittman and Mark Stansberry joined the Board of Directors of QEGP after the IPO. Neither had any prior association with any of the Quest-related entities. Just months afterward, in July 2008, the thefts were discovered. The Board took immediate action. It engaged special counsel to investigate the thefts and insisted on Cash's resignation. It placed Grose on a leave of absence during the investigation. It then sued both Cash and Grose to recover what it could from them.

According to plaintiffs, because the thefts happened, QELP, QEGP, Pittman, and Stansberry must all have violated the federal securities laws. That is simply not the case. Plaintiffs, at best, allege a claim of mismanagement of Quest Resource before QELP or QEGP were formed and before Pittman and Stansberry joined the QEGP Board.

Plaintiffs do not allege violations of the federal securities laws by QELP, QEGP, Pittman, or Stansberry. Plaintiffs' claims under the Securities Exchange Act of 1934 fail to meet the heightened standards of Rule 9(b) and the Private Securities Litigation Reform Act for pleading (1) a material misstatement, (2) made with scienter, and (3) upon which plaintiffs justifiably relied. They also fail to plead secondary "control person" liability. Plaintiffs' claims under the Securities Act of 1933 similarly fail to allege materiality and control person liability, and further fail because the face of their complaint reveals that QEGP was entitled under the due diligence defense to rely on the opinions of expert accountants.

## FACTUAL BACKGROUND

1.   **The Quest Defendants**

   A.   **Quest Resource**

Quest Resource is a fully integrated oil and gas exploration and production company headquartered in Oklahoma. In 2002, Quest Resource bought a company called STP Cherokee, which was owned by Cash, and which became Quest Cherokee, LLC. At that time, Cash joined Quest Resource as its co-CEO. CC ¶ 39.

Two years later, in June 2004, Cash became the sole CEO of Quest Resource. *Id.* ¶¶ 39-40. Cash then hired defendant David E. Grose as CFO of Quest Resource. *Id.*

   B.   **QELP, Gary Pittman, And Mark Stansberry**

QELP is a master limited partnership that Quest Resource formed by offering units representing limited partnership interests in an IPO. Ex. 1, Prospectus, QELP November 9, 2007 SEC Form 424B4, at cover.[2] On July 19, 2007, Quest Resource filed QELP's Registration Statement with the Securities and Exchange Commission (the "SEC"), which became effective on November 7, 2007. CC ¶ 79.

---

[2] The Court may consider documents central to plaintiffs' claims. "[I]f a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997). Moreover, the Court can and should take judicial notice of SEC filings even if they are not incorporated in the complaint because they are public records filed with the Securities Exchange Commission (the "SEC"). *See, e.g., Tal v. Hogan*, 453 F.3d 1244, 1265 n.24 (10th Cir. 2006) (facts that are subject to judicial notice, such as public records, "may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment"); Fed. R. Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding."). Defendants are thus filing excerpts of the relevant documents with this motion.

The Registration Statement and Prospectus included audited financial statements of Quest Resource's operations located in the Cherokee Basin (other than its midstream assets), which were transferred to QELP in the IPO. CC ¶ 83. Quest Resource's outside auditors, Murrell Hall, certified the financials. *Id.* ¶¶ 87-89; Ex. 2, Registration Statement, QELP October 31, 2007 SEC Form S-1/A, at 200, F-8; Ex. 1 at 200, F-8. The Registration Statement and Prospectus are the offering documents for the IPO.

Quest Resource retained about 57% of the limited partnership interest in QELP. CC at p. 13. Quest Resource also owns 100% of defendant QEGP, which is the general partner of QELP. *Id.* And as part of the IPO, QELP became the sole owner of Quest Cherokee. *Id.*

Defendants Pittman and Stansberry joined QEGP's Board of Directors after the IPO. *Id.* ¶ 80. Neither of them had any prior association with Quest Resource; both are independent, outside directors. Pittman began his career in private equity and investment banking, and for the past 15 years has been an active private investor with his own investment company, G. Pittman & Company. Ex. 3, QELP March, 31, 2008 SEC Form 10-K at 79. Pittman was formerly Vice President of a $180 million private equity fund focused on the energy industry, and he has served as a director of numerous oil and natural gas companies. *Id.* Pittman holds a B.A. degree in Economics/Business from Wheaton College and an MBA from Georgetown University. *Id.*

Stansberry currently serves as the Chairman and a director of The GTD Group, which owns and invests in numerous other companies, including energy companies. *Id.* ¶ 79. He also served as 2007 Chairman of The Governor's International Team and serves

on the State Chamber's Energy Council in Oklahoma.  *Id.*  He is President of the International Society of the Energy Advocates through 2009.  *Id.*  Stansberry has testified before the U.S. Senate Energy and Natural Resources Committee and is the author of the book: *The Braking Point: America's Energy Dreams and Global Economic Realities.* *Id.*  Stansberry is a 1977 Bachelor's of Arts graduate from Oklahoma Christian University; a graduate of the Fund for American Studies, Georgetown University; and a graduate of the Intermediate School of Banking, Oklahoma State University.  *Id.*

**2.    The Thefts From The Quest Entities**

In mid-2004, shortly after Cash became the sole CEO of Quest Resource (and years before QELP even existed), Cash devised and began to execute his check-kiting scheme to steal from Quest Resource and Quest Cherokee for his own benefit.  With the assistance of Grose, he secretly began making unauthorized transfers of funds each quarter from different Quest entities to independent entities Cash controlled.  Cash and Grose concealed these transfers, which grew to $10 million before QELP was even formed.  CC ¶¶ 43-54.

In December 2005, Grose and another Quest Resource employee, Douglas Brent Mueller, began participating in a kickback scheme with third-party vendors.  *Id.* ¶ 55-56.  Grose also siphoned money from Quest entities for personal investments under the guise of a loan.  *Id.* ¶ 57.  Through the combination of the check-kiting, kickbacks, and bogus loan, Cash and Grose together stole close to $12 million from the Quest-related entities.  *Id.* ¶ 7.

All the while, Cash and Grose adroitly concealed their thefts. *Id* ¶¶ 8, 39-64. For example, Cash and Grose flat-out lied when drafting, approving, and signing QELP's public filings and disclosures. When Murrell Hall asked Cash and Gross about their transactions, Cash and Grose lied again, explaining that the transfers to Cash's separate company had been made to "scout" oil and gas leases for QELP's benefit. *Id.* ¶¶ 8, 61, 66, 67. Unfortunately, Cash and Grose, as CEO and CFO, were the parties responsible for the integrity of QELP's financial statements. *Id.* ¶¶ 73, 94-95. They thus had the ability to circumvent QELP's financial controls. *Id.* ¶¶ 95-96, 101; Ex. 4, QELP December 21, 2007 SEC Form 10-Q at Exhibits 31.1-31.2. By purposefully exploiting their trusted positions within the Quest entities, Cash and Grose effectively concealed their fraud from the Quest Energy defendants.

3.      **The Thefts Come To Light; QELP And Its Board Respond**

Plaintiffs allege that in July 2008 (about seven months after QELP was formed and Pittman and Stansberry began to serve on the QEGP Board), the check-kiting scheme was discovered in connection with an inquiry by the Oklahoma Department of Securities. CC ¶¶ 65-66. Defendant David Lawler confronted Cash, questioned Grose, and reported the check-kiting scheme to Murrell Hall, the outside auditors. *Id.* Murrell Hall insisted that Cash repay the money immediately, but Cash's $10 million check bounced.

On August 22, 2008, when they learned that the check had bounced, QELP, QEGP, and Stansberry and Pittman, as members of the QEGP Board, took immediate action. CC ¶¶ 69-70. The Boards of the Quest entities held a joint working session to address the check-kiting scheme. *Id.* ¶ 119. They insisted that Cash immediately resign

from all positions at the Quest entities. *Id.* They retained special counsel to investigate the matter. *Id.* They placed Grose on an administrative leave of absence. *Id.; see also* Ex. 5, QELP July 14, 2009 SEC Form 10 Q/A; Ex. 6, QELP August 25, 2008 Press Release. On September 13, 2008, Grose was terminated from all positions with the Quest Entities. CC ¶ 22.

The Quest entities were the victims of a perfect storm. At about the same time as the thefts were discovered, the global economy experienced a significant downturn. *See* Ex. 7, QELP June 16, 2009 SEC Form 10-K at 12. This downturn had two significant consequences for the exploration and production industry. The first consequence was that capital markets essentially froze. Equity, debt, and credit markets shut down. *Id.* Accordingly, growth opportunities for the Quest entities were constrained by the lack of access to liquidity in the financial markets. *Id.*

The second consequence was a significant decline in oil and natural gas prices, which severely damaged QELP's operations and financial condition. *Id.* Particularly, natural gas prices came under pressure in the second half of the year as a result of lower domestic product demand that was caused by the weakening economy and concerns over excess supply of natural gas. *Id.* Overall, as a result, QELP's operating margins were affected adversely during the second half of 2008 and continue to be impaired during 2009. *Id.*

### 4.    Quest Resource Absorbs The Loss From The Thefts

QELP detailed the effects of the thefts in its June 16, 2009 restated Form 10-K. Ex. 7 at 5-7. Specifically, QELP explained that Cash's check-kiting scheme caused

QELP (and its predecessor, Quest Cherokee) to overstate cash balances and partners' equity by $10 million from its formation, in part because the scheme had indirectly caused Quest Cherokee to borrow an additional $9.5 million under its credit facilities. *Id.*

That overstatement, however, was not material to QELP because Quest Resource had repaid the $9.5 million of indebtedness at the closing of the IPO with no obligation for QELP to repay that amount to Quest Resource. *Id.* The additional $0.5 million, which had been recorded on Quest Cherokee's balance sheet in error, was returned to QELP by a Quest Resource subsidiary after closing of the IPO. *Id.*; *see also* Ex. 8, Quest Resource June 3, 2009 SEC Form 10-K at 3-5, 12-13 (reflecting $10 million loss to Quest Resource). Simply put, Quest Resource, not QELP, absorbed the loss resulting from the check-kiting scheme. And plaintiffs nowhere allege that the $1.8 million that Grose and his cohorts stole through the kickback scheme and bogus loan was material to QELP or QEGP, or that their disclosure impacted the price of QELP's units.

## ARGUMENT & AUTHORITIES

**1.    Plaintiffs Have Pleaded Merely Conclusory Allegations And Thus Have Not Met The Standards To Survive A Motion To Dismiss**

The Supreme Court has recently raised the pleading bar for a complaint to withstand a Rule 12(b)(6) motion. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A court must accept all factual allegations as true, but this requirement does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* The court's determination of whether a complaint states a "plausible claim for relief" is a "context-specific inquiry" that requires application of "judicial experience and common sense." *Id.* Unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

The complaint here, while long on verbiage, is short on specifics tying the Quest Energy defendants to the elements of plaintiffs' claims for securities violations.

**2.    Plaintiffs' Claims Under The Securities Exchange Act Of 1934 Should Be Dismissed For Failure To State A Claim**

**A.    The PSLRA And Rule 9(b) Create A Heightened Pleading Standard For Claims Under Section 10(b)**

To successfully plead a claim for violating Section 10(b) and Rule 10b-5, plaintiffs must allege with the requisite particularity that the QELP defendants: (1) made a material misstatement or omission; (2) in connection with the purchase or sale of securities; (3) with scienter, i.e., with intent to defraud or recklessness; (4) upon which plaintiffs relied; (5) that plaintiffs suffered an economic loss; and (6) that the material misrepresentation was the cause of that loss, i.e., loss causation. *E.g., In re Williams Sec. Litig. WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir. 2009) (citations omitted). Plaintiffs must not only do so with the particularity required by Fed. R. Civ. P. 9(b), but under the PSLRA as well, which was enacted to curb abuse in private securities lawsuits. *See Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003). The PSLRA

requires that a court ***must dismiss*** complaints that do not meet all of its requirements. 15 U.S.C. § 78u-4(b)(3).

Here, plaintiffs at best claim breach of fiduciary duty rather than securities fraud, which is highlighted by their failure to plead facts to support the essential elements of their Section 10(b) claim of materiality, scienter, and reliance.

**B.    Plaintiffs' Claim Is At Most An Artfully Pleaded Breach-of-Fiduciary-Duty Claim And Therefore Should Be Dismissed**

Plaintiffs allege that QELP's SEC filings were materially false and misleading because they failed to disclose the thefts by Cash and Grose. But plaintiffs admit that Cash and Grose very effectively hid their thefts. CC ¶¶ 47-54. And plaintiffs also admit that QELP's auditors, Murrell Hall, did not disclose the thefts to QELP, QEGP, Pittman, Stansberry, or Lawler. CC ¶¶ 58-64. Plaintiffs have described at best a breach-of-fiduciary-duty case belonging to QELP as the allegedly injured party. This is not an actionable Section 10(b) securities-fraud case.

Shareholders cannot disguise a state-law claim for breach of fiduciary duty or self dealing as a Section 10(b) claim. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 265 (1977). *Santa Fe* requires a court to distinguish between an actionable omission of a material fact and a claim for breach of a state-law fiduciary duty. *Kas v. Financial Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986). The *Kas* court explained:

> Though *Santa Fe* does not bar a claim related to a breach of fiduciary duty if there has been a material misrepresentation or omission, a plaintiff may not "bootstrap" a claim of breach of fiduciary duty into a federal securities claim by alleging that directors failed to disclose that breach of fiduciary duty. ***That is true even though knowledge that an officer or director had actually breached his fiduciary duty might well satisfy the materiality***

*requirement that the omitted or misstated fact be likely to "have assumed actual significance in the deliberations of the reasonable shareholder."*

In *Santa Fe* the Court explained its reluctance to "federalize" substantial portions of the state law of corporations absent some clear indication of congressional intent and cautioned against the creation of a federal common law of fiduciary obligations. To avoid these results, liability under the federal securities laws should not turn on the resolution of essentially state-law issues. ***Thus, if the validity of a shareholder's claim of material misstatement or nondisclosure rests solely on a legal determination . . . that an officer or director's conduct amounted to a breach of his fiduciary duty, the claim does not state a cause of action under sections 10(b) or 14(a) of the Securities Exchange Act.***

*Id.* (internal citations and quotations omitted).

Other circuits agree. For example, the Third Circuit has held that *Santa Fe* bars an otherwise actionable Section 10(b) claim where an omission is material only because it would "place potential investors on notice that management is culpable of a breach of faith or incompetence." *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 640 (3d Cir. 1989). The Seventh Circuit similarly has held that if "the central thrust of a claim or a series of claims arises from acts of corporate mismanagement, the claims are not cognizable under federal law." *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir. 1981) (internal citations omitted).

Here, the gravamen of plaintiffs' claim is that Cash and Grose breached their fiduciary duties to QELP by failing to disclose the check-kiting scheme in the financial statements and by representing that QELP's control over financial reporting was effective. *E.g.*, CC ¶ 97. But Quest Resource -- not QELP -- bore the entire brunt of the check-kiting scheme. Its only relevance to QELP is as a breach of Cash's and Grose's fiduciary duties. Accordingly, plaintiffs' claim under Section 10(b) must be dismissed.

C.    **Plaintiffs Have Failed To Plead The Required Element Of Materiality**

Plaintiffs have not pleaded materiality, which is an essential element of their Section 10(b) claim. *See City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1257 (10th Cir. 2001). "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Id.* at 1265. *See also Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993) ("the definition of materiality developed under the federal securities laws contemplates a showing of a substantial likelihood that, under all the circumstances, the omitted facts would have assumed actual significance in the deliberations of the reasonable investor") (internal quotation marks, brackets, and footnote omitted).

Plaintiffs allege that the financial statements in QELP's Registration Statement were false and misleading because they did not disclose the check-kiting scheme. CC ¶¶ 187-88. But as shown above, the check-kiting scheme did not impact QELP because Quest Resource and one of its subsidiaries repaid the $10 million to QELP at about the time of the IPO. *See* Ex. 7 at 5. Thus, while the thefts may have had a material impact on Quest Resource, they did not have any real impact on QELP as a matter of law.

D.    **Plaintiffs Fail To Allege Scienter**

Plaintiffs' scienter allegations fall well short of the PSLRA's requirements. Rather than pleading scienter generally, as allowed in other fraud cases, plaintiffs alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Adams*, 340 F.3d at 1096 (quoting 15 U.S.C. § 78u-4(b)(2)). Generally, that means "a mental state embracing

intent to deceive, manipulate, or defraud, or recklessness." *Adams*, 340 F.3d at 1105 (internal quotation marks omitted). An inference of scienter is "strong" under the PSLRA "only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Maker Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).[3]

Plaintiffs allege only conclusory statements of law suggesting that the Quest Energy defendants may somehow have been negligent in failing to discover Cash's and Grose's conduct. Yet plaintiffs do not allege that any of the Quest Energy defendants knew of Cash's and Grose's conduct. *See* CC ¶¶ 65-71. The CC reveals the careful, coordinated efforts Cash and Grose undertook to conceal their conduct from the Quest Energy defendants. *Id.* ¶¶ 39-71. Plaintiffs' allegations regarding the scienter of the Quest Energy defendants are pure allegations of fraud by hindsight.[4]

Because plaintiffs do not allege that the Quest Energy defendants had actual knowledge of the thefts, plaintiffs must plead facts to establish each Quest Energy defendants' severe reckless disregard for QELP's internal controls. To do so, they must allege that each Quest Energy defendant engaged in "'conduct that is an extreme

---

[3] In other words, the scienter standard imposed by the PSLRA requires "a very stringent pleading standard for securities plaintiffs, purportedly higher than any federal court had imposed up to that point in time." *City of Philadelphia*, 264 F.3d at 1259 (citations omitted).

[4] *See, e.g., City of Philadelphia*, 264 F.3d at 1260 (noting that the Tenth Circuit prohibits "fraud by hindsight" pleading in securities fraud cases); *In re Cabletron Sys.*, 311 F.3d 11, 37 (1st Cir. 2002) (rejecting "fraud by hindsight" pleading); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1084-85 (9th Cir. 2002) (the PSLRA intended to "put an end to the practice of pleading 'fraud by hindsight'").

departure' from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *City of Philadelphia*, 264 F.3d at 1258 (citations omitted).

Courts, however, are "cautious about imposing liability for securities fraud based on reckless conduct." *Id.* at 1260. The Tenth Circuit has thus "identified several important limitations on the scope of liability for securities fraud based on reckless conduct." *Id.* (citations omitted). "Plaintiffs should not be allowed to proceed with allegations of 'fraud by hindsight,' for example, because corporate officials should be liable for failing to reveal only 'those material facts reasonably available to them.'" *Id.* (citations omitted) Again, plaintiffs come up short.

Plaintiffs also fail to tie their allegations to each of the Quest Energy defendants. For example, the CC provides no specific facts alleging each of the Quest Energy defendants' reckless disregard of QELP's internal controls. Rather, the CC alleges only how Murrell Hall failed to discover the check-kiting scheme behind the thefts. *See* CC ¶¶ 58-64. "[W]here fraud is alleged against multiple defendants, blanket allegations of fraud couched in language such as 'by the defendants' are insufficient. Instead, the specifics of the alleged fraudulent activity of each defendant must be set forth." *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1094 (N.D. Okla. 2003). *See also Sheldon v. Vermonty*, 31 F. Supp. 2d 1287, 1292 (D. Kan. 1998) (dismissing complaint that "fails to identify to which defendant each misrepresentation is attributed").

The CC pleads scant facts. QELP and QEGP were formed for the IPO, and Stansberry and Pittman became directors of the QEGP Board only after the IPO closed.

*See* CC ¶¶ 24-25. At that point, Cash and Grose had already stolen the $10 million. *Id.*
The multi-year check-kiting scheme was discovered just months after the IPO closed. *Id.*

Plaintiffs point to QELP's "Corporate Governance Guidelines," SEC Filings, and
accounting guidelines for related-party transactions to suggest that the Quest Energy
defendants demonstrated a reckless disregard for QELP's internal controls by failing to
uncover the check-kiting scheme as members of the Audit Committee. *Id.* ¶¶ 72-78, 143-
68. But as the Supreme Court has observed, "[f]inancial accounting is not a science."
*Shalaha v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995). "Generally accepted
accounting principals, rather, tolerate a range of reasonable treatments, leaving the choice
among alternatives to management." *Id.* Thus, it is well-settled that "[t]he failure to
follow GAAP is, by itself, insufficient to state a securities fraud claim." *Mortensen v.
AmeriCredit Corp.*, 123 F. Supp. 2d 1018, 1026 (N.D. Tex.), *aff'd*, 240 F.3d 1073 (5th
Cir. 2000) (collecting cases).[5]

E.    **Plaintiffs Cannot Impute Cash's And Grose's Scienter To The Quest
      Energy Defendants**

The scienter of Cash and Grose cannot be imputed to the Quest Energy
defendants. When a corporate insider acts adversely to the interests of a corporation and
for his own personal benefit, the adverse interest exception prevents the corporate
insider's scienter from being imputed to the corporation. *In re Crazy Eddie Sec. Litig.*,
802 F. Supp. 804, 817 (E.D.N.Y. 1992). Under this exception, the independent fraud of

---

[5] The Tenth Circuit has also rejected scienter allegations that amount to common desires
shared by all businesses and executives, such as a company's desire to facilitate an
offering or the desire of executives "to protect their own positions with the company and
the value of their own . . . stock." *City of Philadelphia*, 264 F.3d at 1269.

an agent acting "on his own account" will not ordinarily be imputed to the principal. *Aetna Cas. and Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 541-42 (6th Cir. 2000).

Through the check-kiting scheme, the kickbacks, and Grose's fraudulent personal loan, Cash and Grose looted the Quest Entities for their own personal interests. CC ¶¶ 39-57.  Cash and Grose consistently lied to QELP's independent auditors, the Audit Committee, and members of the Board about the purpose and nature of the check-kiting scheme to intentionally conceal them from the Quest Entities. *Id.* ¶¶ 58-71.  Grose even went so far as to fabricate Board Minutes authorizing the transfers through which the check-kiting scheme was accomplished. *Id.*  Clearly, Cash and Grose acted outside the scope of their apparent authority as CEO and CFO of QELP by placing their personal interests before those of QELP.  *Adams*, 340 F.3d at 1106-07 (the scienter of senior controlling officers may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 only "when those senior officials were acting within the scope of their apparent authority").

This conduct, which includes theft of the Quest entities' assets for their own personal use, is the type of conduct traditionally considered adverse to the principal. Indeed, this type of looting of corporate assets is the classic example of when the adverse interest exception should be applied. *Baena v. KPMG LLP*, 453 F.3d 1, 8 (1st Cir. 2006); *see also In re Cendant Corp. Sec. Litig.*, 109 F. Supp. 2d 225, 232 (D.N.J. 2000) (noting cases concerning misappropriation by corrupt officers of corporate funds for personal use -- a situation clearly involving adverse interests); *Beck v. Deloitte & Touche*, 144 F.3d

732, 737 (11th Cir. 1998); *In re Fuzion Tech. Group, Inc.*, 332 B.R. 225, 237 (Bankr. S.D. Fla. 2005).

Acting on their own account, Cash and Grose looted the Quest Entities for their own personal benefit and purposefully concealed their conduct from the Quest Energy defendants to avoid detection. CC ¶¶ 43-48, 55-57. Their intent to steal from the Quest Energy defendants cannot be attributed to their victims. No other scienter is alleged with respect to the Quest Energy defendants. Plaintiffs' Rule 10b-5 claim should be dismissed.

### F.    Plaintiffs Have Not Pleaded The Element Of Reliance As Required For Their Section 10(b) Claim

Plaintiffs do not even try to plead that any of them actually relied on any of the alleged misstatements. Instead, plaintiffs allege that they are entitled to a presumption of reliance under the fraud-on-the-market doctrine. *Id.* ¶¶ 176-77. The fraud-on-the-market presumption "recognizes that in an open, efficient, and developed market, where millions of shares are traded daily, the investor must rely on the market to perform a valuation process which incorporates all publicly available information, including misinformation". *Joseph v. Wiles*, 223 F.3d 1155, 1163 n.2 (10th Cir. 2000).

The fraud-on-the-market presumption, therefore, applies only to efficient, well-developed markets. That presumption of reliance does not apply to initial public offerings because there is no preexisting, well-established market for the securities at issue. *Id.*, 223 F.3d at 1163-65. As a matter of law, "the market for IPO shares is not efficient." *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006). For

example, in an IPO, it cannot be presumed that a security's price reflects its "real" value because interested parties -- not the market -- have set the price. *Gruber v. Price Waterhouse*, 776 F. Supp. 1044, 1052 (E.D. Pa. 1991). "Therefore, a buyer cannot assume the price he pays reflects all the information in the market." *Id.*[6]

QELP's Prospectus itself made clear that the market for QELP units was inefficient: "Prior to this offering, there has been no public market for the common units. The initial public offering price was determined by negotiation between us and the underwriters." Ex. 1, Prospectus at 197.

Moreover, the CC contains no facts to suggest when (if ever) and how the market for QELP units became well-developed enough to warrant a fraud-on-the-market presumption of reliance. The CC's conclusory allegation that "[a]t all relevant time, the market for QELP securities was an efficient market," CC ¶ 176, is clearly wrong as a matter of law. Plaintiffs have not pled a single fact -- much less with the particularity required by Rule 9(b) -- to indicate when or how that situation changed. And QELP's Prospectus specifically warned that a market might never develop:

---

[6] The Tenth Circuit in *Joseph v. Wiles* identified three very limited circumstances in which purchasers in an IPO might be entitled to a presumption of reliance: (1) pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), where the plaintiffs complained primarily of omissions as opposed to affirmative misrepresentations; (2) under the fraud-created-the-market doctrine if the defendants' fraud allowed securities that would have been unmarketable to come into and exist in the market; and (3) under a reliance-on-the-regulatory-process doctrine. 223 F.3d at 1162-66. Plaintiffs do not allege any facts or even legal conclusions to imply they might fall within one of those exceptions.

> Unitholders may have limited liquidity for their common units, a trading
> market may not develop for the common units and you may not be able to
> resell your common units at or above the initial public offering price.

Ex. 1, Prospectus at 48. The QELP plaintiffs are not entitled to any presumption of

reliance, and they have not attempted to allege actual reliance to make out a § 10(b)

claim.

### G.    Plaintiffs' Control Person Claim Under Section 20(a) Fails As A Matter Of Law

Plaintiffs also fail to state a claim for control person liability under Section 20(a).

"To state a prima facie case of control person liability, the plaintiff must establish (1) a

primary violation of the securities laws and (2) 'control' over the primary violator by the

alleged controlling person." *City of Philadelphia*, 264 F.3d at 1270-71 (citing *Maher v.*

*Durango Metals, Inc.*, 144 F.3d 1302 (10th Cir. 1998)). As demonstrated above,

plaintiffs have not pleaded a viable primary violation of § 10(b) against any of the Quest

Energy defendants.

Moreover, plaintiffs have not pled sufficient facts to demonstrate that the Quest

Energy defendants had actual power to control or influence the conduct of Cash and

Grose. "To make this showing, the plaintiffs must point to facts which indicate that the

defendants had possession, direct or indirect, of the power to direct or cause the direction

of the management and policies of a person, whether through the ownership of voting

securities, by contract, or otherwise." *Adams*, 340 F.3d at 1108 (citations and internal

quotation marks omitted).

80676726                                    - 19 -

Here, plaintiffs offer only the names, positions, and titles of the Quest Energy defendants, the fact that their names appear on QELP documents, and conclusory allegations. *See* CC ¶¶ 18-20, 23-25, 216.  But as a matter of law, control-person liability cannot hinge solely upon positions or titles. *See Dennis v. General Imaging, Inc.*, 918 F.2d 496, 509-10 (5th Cir. 1990); *In re Digital Island Sec. Litig.*, 223 F. Supp. 2d 546, 561 (D. Del. 2002), *aff'd*, 357 F.3d 322 (3d Cir. 2004) ("it is well-settled that '[t]he mere fact that an individual is a director of a firm is not sufficient to show he is a control[lung] person of the firm'") (citation omitted).   Similarly, an officer's or director's status, including membership on the audit committee or signing an allegedly misleading corporate SEC filing, is insufficient, standing alone, to demonstrate control of the company. *See In re Rospatch Sec. Litig.*, 760 F. Supp. 1239, 1264 (W.D. Mich. 1991).

Plaintiffs allege that "Cash, Grose, Lawler, [QEGP] and [Quest Resource], had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same." CC ¶ 217.  The CC, however, offers no specific facts to support this allegation.  These sort of extensive boiler-plate, conclusory allegations do not make up for plaintiffs' failure to plead sufficient facts to assert a control person liability under § 20(a) against the Quest Energy defendants.

3.    **Plaintiffs Fail To State A Claim Under The Securities Act Of 1933**

    A.    **Plaintiffs Fail To Plead The Required Element Of Materiality**

As demonstrated above, plaintiffs have not pleaded materiality adequately for their Section 10(b) claim. Materiality is also an essential element of a Section 11 claim under Securities Act. "It is axiomatic that to be actionable under Section 11, Section 12(a)(2) or Rule 10b-5, a statement or omission must be "materially misleading."" *See, e.g., Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 204 (2d Cir. 1980) (Sections 11 and 12(a)(2) require that misstatements be "material"); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120 (10th Cir. 1997) (materiality is element in 10b-5 claims); *City of Philadelphia*, 264 F.3d at 1257 (same).

And the test for materiality is the same under both Section 11 and Section 10(b). "The same standard of materiality . . . applies to claims under Section 10(b) and Rule 10b-5 as to claims under Sections 11 and 12(2) of the Securities Act." *Shaw v. Digital Equipment Corp.*, 82 F. 3d 1194, 1217 (1st Cir. 1996) (citing *Lucia v. Prospect St. High Income Portfolio, Inc.*, 36 F.3d 170, 172 n. 3 (1st Cir. 1994)). Therefore, because plaintiffs have not pleaded materiality for purposes of Section 10(b), they similarly have not done so under Section 11, and their Section 11 claim against the Quest Energy defendants should be dismissed.

    B.    **Plaintiffs' Complaint Reveals That The Due Diligence Defense Protects QEGP From Liability Under Section 11 Of The Securities Act Of 1933**

It is readily apparent from the face of plaintiffs' complaint that the due diligence defense under Section 11 of the Securities Act allows QEGP to rely on the expert opinion

of the outside accountants, Murrell Hall, for the accuracy of the financial statements in the Prospectus and Registration Statement. "Under Rule 12(b), F.R.Civ.P., a defendant may raise an affirmative defense by a motion to dismiss for the failure to state a claim . . . . [i]f the defense appears plainly on the face of the complaint itself." *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965) (citation omitted).

Section 11 imposes liability on an issuer of securities where a registration statement or prospectus contains material misstatements or omits material facts. 15 U.S.C. § 77k; *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983). But Section 11 defendants like QEGP, which is not the issuer of the securities, may avoid liability if they performed adequate due diligence. *See* 15 U.S.C. § 77k(b)(3).

The adequacy of due diligence depends on (1) whether or not a person qualifies as an expert and (2) which portions of the offering materials are allegedly false or misleading. Subsection 11(a)(4) defines an expert as a person whose profession gives authority to her statements, including, accountants, engineers, and appraisers. 15 U.S.C. § 77k(a)(4). Plaintiffs do not allege that QEGP performs any of those functions, and QEGP is not identified as an expert in the Registration Statement or Prospectus.[7] Because QEGP is not alleged to be an expert, "the standard of reasonableness shall be that required of a prudent man in the management of his own property." 15 U.S.C.

---

[7] Indeed, QELP's Registration Statement and Prospectus explain that a different Quest entity performs those functions: ***"Quest Energy Service will operate our assets and perform other administrative services for us such as accounting, corporate development, finance, land, legal and engineering."*** Ex. 2, Registration Statement at 42; Ex. 1, Prospectus at 42.

§ 77k(c).  *See also In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 663 (S.D.N.Y 2004).

The financial statements that plaintiffs allege were false and misleading are "expertised" portions of the offering materials.  Generally, an expertised portion of a registration statement is one that has been prepared or certified, indirectly or directly, by an expert who is named as such in the registration statement.  *See Escott v. BarChris Constr. Co.*, 283 F. Supp. 643, 683 (S.D.N.Y. 1968) (referring to the part of the registration statement expressly made on the expert's authority as the expertised portion of the statement).  Plaintiffs allege that QELP's Registration Statement and Prospectus contained false and misleading statements because the financial statements did not account for the thefts of Cash and Grose.  CC ¶¶ 79-90.

An accountant's opinion qualifies as an expert opinion under Section 11(b)(3)(C) when (1) it is reported in the Registration Statement, (2) is an audit opinion, and (3) the accountant agreed to include it in the registration statement.  *In re WorldCom*, 346 F. Supp. 2d at 664-65.  QELP's Prospectus and Registration Statement meet each of these requirements.  *See* Ex. 1, at 200; Ex. 2, at 200.  By meeting each of these criteria, the Murrell Hall opinion expertised the financials.

The Securities Act provides that "as regards any part of the registration statement purporting to be made on the authority of an expert," a defendant other than that expert will not be liable if he demonstrates that "he had no reasonable ground to believe and did not believe, at the time such part of the registration statement became effective, that the statements therein were untrue or that there was an omission to state a material fact

required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3)(C).

Plaintiffs do not allege that QEGP had no reasonable ground to believe and did not believe that the Murrell Hall's expertised portions of the Prospectus and Registration Statement, as of their effective dates, were inadequate.    Accordingly, plaintiffs' Section 11 claim against QEGP because should be dismissed because it is apparent from the face of the complaint that QEGP was entitled to rely on Murrell Hall's opinion as adequate due diligence.

## C.    Plaintiffs Have Not Pleaded Proper Control Person Liability Against QEGP Under Section 15 Of The Securities Act

Plaintiffs do not plead facts sufficient to support a claim for control person liability against QEGP because no alleged facts demonstrating that QEGP knew or had a reasonable ground to believe that Cash and Grose were committing a violation of Section 11.  Under § 15 of the Securities Act "[e]very person who . . . controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, *unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist*."  15 U.S.C. § 77o.

Plaintiffs plead no facts to suggest that QEGP (as opposed to Murrell Hall) knew or should have known of the thefts.  CC ¶¶ 58-64.  Rather, plaintiffs' own allegations reveal that when QEGP first learned of the thefts, it took immediate action to expose and

remedy the matter. *Id.* ¶¶ 65-70. A defendants' later disclosure of wrongdoing does not establish a defendant's failure to conduct a reasonable investigation or exercise reasonable care. *See Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1020 n.4 (5th Cir. 1996) ("[a] corporation does not admit that previous SEC filings are misleading every time it amends or updates language in new filings"). Because the CC contains no facts to suggest that QEGP knew or should have known of the thefts, plaintiffs' Section 15 claim against QEGP must be dismissed.

**4.    No Amount Of Repleading Will Resolve The Complaint's Shortcomings**

Plaintiffs should not be permitted to amend the CC against the QELP defendants. The CC is not plaintiffs' first attempt to file a complaint in this matter. Initially, plaintiffs filed four separate class action complaints. Upon consolidation, plaintiffs had a fifth attempt to replead their allegations with the added benefit of their pooled resources and plenty of time to conduct a thorough investigation. After five attempts to formulate a valid complaint, it is readily apparent that another attempt would simply be futile and plaintiffs should not be granted another bite at the apple. *See Grossman*, 120 F.3d at 1126 (courts should not grant leave to amend where it would be futile).

## CONCLUSION

For these reasons, defendants Quest Energy Partners L.P., Quest Energy GP LLC, Gary Pittman, and Mark Stansberry move to dismiss the Consolidated Complaint of Quest Energy Partners LP Lead Plaintiff Group and grant the Quest Energy defendants all other relief to which they are justly entitled.

Respectfully submitted,


Robert S. Harrell*
Anne M. Rodgers*
FULBRIGHT & JAWORSKI L.L.P.
1301 McKinney, Suite 5100
Houston, Texas  77010
Telephone:  (713) 651-5151
Telecopier:  (713) 651-5246
rharrell@fulbright.com
arodgers@fulbright.com
* Admitted pro hac vice

Eric S. Eissenstat, OBA #10282
FELLERS, SNIDER, BLANKENSHIP,
    BAILEY & TIPPENS
100 North Broadway, Suite 1700
Oklahoma City, Oklahoma  73102
Telephone:  (405) 232-0621
Telecopier:  (405) 232-9659
eeissenstat@fellerssnider.com

*Attorneys for Defendants Quest Energy
Partners L.P., Quest Energy GP LLC, Gary
Pittman, and Mark Stansberry*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2009, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to all registered counsel of record.

Anne M. Rodgers