UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

MICHAEL FRIEDMAN, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED,

        Plaintiff,

v.

QUEST ENERGY PARTNERS LP;
QUEST ENERGY GP LLC; QUEST
RESOURCE CORPORATION; JERRY D.
CASH; DAVID E. GROSE; DAVID C.
LAWLER; GARY PITTMAN; MARK
STANSBERRY; MURRELL, HALL,
McINTOSH & CO., PLLP; AND EIDE
BAILLY LLP,

        Defendants.

CASE NO. 08-cv-936-M

JUDGE VICKI MILES-LaGRANGE

---

**MURRELL, HALL, McINTOSH & CO. , PLLP'S AND EIDE BAILLY LLP'S
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT
AND SUPPORTING MEMORANDUM OF LAW**

Thomas J. Shroyer
Peter A. Koller
Terese A. West
MOSS & BARNETT, P.A.
4800 Wells Fargo Center, 90 S. 7th Street
Minneapolis, MN  55402-4129
Telephone:  (612) 877-5407
Facsimile:  (612) 877-5999
Email:  shroyert@moss-barnett.com
Email:  kollerp@moss-barnett.com
Email:  west@moss-barnett.com

Thomas G Wolfe, OBA No. 11576
Jason M. Kreth, OBA No. 21260
PHILLIPS MURRAH PC
101 N Robinson Ave, 13 Floor
Oklahoma City , OK 73102
Telephone: 405-235-4100
Facsimile: 405-235-4133
Email: ecf@phillipsmurrah.com
Email: jmkreth@phillipsmurrah.com

*ATTORNEYS FOR DEFENDANTS MURRELL, HALL,
MCINTOSH & CO., PLLP, AND EIDE BAILLY LLP*

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ............................................................................. 1

FACTS ............................................................................................................. 2

ARGUMENT ................................................................................................... 10

    I.     APPLICABLE STANDARD. ...................................................10

    II.    PLAINTIFFS FAIL TO STATE A CLAIM AGAINST THE
          ACCOUNTANTS UPON WHICH RELIEF CAN BE GRANTED. ..........12

          A.    Plaintiffs Fail to Allege Facts That Give Rise to Strong Inference of
              Scienter. ............................................................................................12

              1.    The group pleading doctrine does not apply to the
                    accountants. ........................................................................14

              2.    Quest's top executives conspired to deceive the auditors. ....15

              3.    It is well settled that alleged violations of professional
                    standards do not give rise to a strong inference of scienter...17

          B.    Plaintiffs Fail to Adequately Plead Loss Causation. ........................19

          C.    Plaintiffs Otherwise Fail to State a Claim Against Eide Bailly........22

              1.    Plaintiffs Do Not Attribute Any Material Misstatement or
                    Omission to Eide Bailly........................................................22

               2.    Plaintiffs Fail to State a Plausible Claim for Successor
                    Liability Against Eide Bailly.................................................24

    III.   PLAINTIFFS SHOULD BE DENIED ANY REQUEST TO REPLEAD..25

CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ........................................................ 10, 11, 12, 24

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) ......................................................... 10, 11

*Cal. Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126 (3rd Cir. 2004)... 11, 15

*Chill v. General Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) .................................................. 17

*City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245 (10th Cir. 2001)...................... 12, 17

*Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144 (S.D.N.Y. 2007) ............................ 24

*Crutchfield v. Maine Power Engine Co.*, 209 P.3d 295 (Okla. 2009) .............................. 24

*Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111 (2d Cir. 1982) ................................. 17, 22

*DSAM Global Value Fund v. Altrist Software*, 288 F.3d 385 (9th Cir. 2002)...... 15, 18, 19

*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005) ............................................ 10, 19, 20

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).......................................................... 12

*Ezra Charitable Trust v. Tyco Int'l Ltd.*, 466 F.3d 1 (1st Cir. 2006)......................... 17, 19

*Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851 (8th Cir. 2005)............. 18

*Fidel v. Farley*, 392 F.3d 220 (6th Cir. 2004)................................................................. 18

*Forrest v. Beloit Corp.*, No. CIV. A. 00-CV-5032, 2001 WL 1251460 (E.D. Pa. Sep. 21, 2001) ....................................................................................................................... 24, 25

*Garfield v. NDC Health Corp.*, 466 F.3d 1255 (11th Cir. 2006) ..................................... 18

*In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999) .................................. 12, 18

*In re Fitzhenry*, 162 P.3d 260 (Or. 2007)......................................................................... 6

*In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968 (S.D. Ohio 2008) ....................... 14, 15

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452 (S.D.N.Y. 2006)... 14

*In re Semgroup Energy Partners, L.P., Sec. Litig.*, Case No. 08-MD-1989-GKF-FJM, 2009 WL 3713524 (N.D. Okla. Nov. 4, 2009) ................................................................. 2

*In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242 (N.D. Okla. 2003) ................................ 14

*In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195 (N.D. Okla. 2007) ......................... 12, 13

*Keeney v. Larkin*, 306 F. Supp. 2d 522 (D. Md. 2003) ..................................................... 18

*Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2006) ......................................................... 18

*Lillard v. Stockton*, 267 F. Supp. 2d 1081 (N.D. Okla. 2003) ......................................... 15

*McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702 (10th Cir. 2006).............. 18

*Nova Molecular Techs., Inc. v. Penn Specialty Chems., Inc.*, No. 08-2039-STA, 2009 WL 564433 (W.D. Tenn. Mar. 5, 2009) ..................................................................... 24, 25

*Public Employees' Retirement Assoc. of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305 (4th Cir. 2009)................................................................................................... 12, 15, 16

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ............................................................. 23

*Schwartz v. Celestial Seasonings*, 124 F.3d 1246 (10th Cir. 1997)................................. 14

*SEC v. Cash et al.*, Civil Action No. 5:09-cv-639-L (W.D. Okla.) ................................ 3, 4

*Stevelman v. Alias Research, Inc.*, 174 F.3d 79 (2d Cir.1999) ......................................... 18

*Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc.*, 552 U.S. 148 (2008) ............. 10

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308 (2007) ............... 2, 11, 13, 18

*U.S. v. Cash*, Case No. 5:09-cr-00241-D (W.D. Okla.).................................................. 3, 8

*U.S. v. Grose*, Case No. CR 09-191 HE (W.D. Okla.) .................................................. 3, 8

*Wool v. Tandem Computers, Inc.*, 818 F.2d 1433 (9th Cir. 1987).................................... 14

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d 1998) ................................................... 23

**STATUTES**

15 U.S.C. § 7262 ................................................................................................................ 17

15 U.S.C. § 78u-4(b) .............................................................................................. 11, 12, 23

18 U.S.C. § 1350 .................................................................................................................. 7

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................... 1, 10, 11

Fed. R. Civ. P. 9(b) ...................................................................... 1, 11, 12

**REGULATIONS**

17 C.F.R. § 240.13a-14 ....................................................................... 7

17 C.F.R. § 240.13b2-2 ....................................................................... 8

Defendant accounting firms Murrell, Hall, McIntosh & Co., PLLP ("Murrell Hall") and Eide Bailly LLP ("Eide Bailly") move to dismiss the Consolidated Complaint of Quest Energy Partners LP Lead Plaintiff Group for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

## SUMMARY OF ARGUMENT

This putative class action arises from a fraudulent check-kiting scheme perpetrated by top executives of Quest Resource Corporation ("QRC") that allegedly left QRC subsidiary Quest Energy Partners LP ("QELP") out $10 million. Plaintiffs allege that the failure of QELP's independent auditor, Murrell Hall, to detect the scheme and disclose it on financial reports filed with the SEC in support of QELP's initial public offering constitutes securities fraud, and they seek to hold Murrell Hall and its alleged "successor entity," Eide Bailly, liable under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

Plaintiffs' claims against the accountants should be dismissed. First, that Murrell Hall failed to detect the lies and collusion by its client's top management is not remotely akin to fraudulent intent. Plaintiffs' conclusory allegations that Murrell Hall made accounting errors and did not conduct its audits in accordance with generally accepted auditing standards suggest nothing more than negligence and do not give rise to the strong inference of scienter needed to allege securities fraud. Second, plaintiffs fail to tie any disclosure of the check-kiting scheme to any decline in QELP's share price, and thus

fail to adequately allege loss causation. Finally, plaintiffs' conclusory allegations against Eide Bailly fail to state a plausible claim of successor liability.

**FACTS**[1]

**The Parties**

The Consolidated Complaint was brought by lead plaintiffs Mark Barretti, Samuel Hyman, Leslie Sundquist, Billy Truit, and Francis Biermeier, known collectively as the "Barretti Group," on behalf of all persons who purchased or otherwise acquired common shares of defendant Quest Energy Partners LP ("QELP") at any time from QELP's initial public offering ("IPO") on November 7, 2007, through August 24, 2008. (Cons. Compl., ¶¶ 1, 33.) Plaintiffs allege that false statements, misrepresentations and omissions in QELP's financial reports damaged plaintiffs by causing them to invest in QELP at artificially inflated prices. (*Id.*, ¶ 206.)

Defendant Quest Resource Corporation ("QRC") is the holding company for a family of oil and natural gas exploration, production, and distribution companies (collectively referred to herein as "Quest"). (*Id.*, ¶¶ 18-20.) In 2007, QRC formed QELP to serve as its production and operations arm and, upon completion of QELP's IPO,

---

[1] When ruling on a 12(b)(6) motion to dismiss, the court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on [such] motions …, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," such as matters of public record. *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re Semgroup Energy Partners, L.P., Sec. Litig.*, Case No. 08-MD-1989-GKF-FJM, 2009 WL 3713524 (N.D. Okla. Nov. 4, 2009) (holding that SEC filings, analyst reports, spot price charts and graphs, stock indexes, and other information available on the internet are proper subjects for judicial notice).

contributed its operations in the Cherokee Basin to QELP. (*Id.*, ¶ 18; Decl. of Terese A. West ("West Decl."), Ex. G, Amend. Compl., in *SEC v. Cash et al.*, Civil Action No. 5:09-cv-639-L (W.D. Okla.) ("SEC Compl."), ¶ 11.) QELP is the largest producer of natural gas in the Cherokee Basin, which comprises a 13-county region located in southeast Kansas and northeast Oklahoma. (West Decl., Ex. C, Form 8-K, filed August 25, 2008, at Press Release, p. 2.)

Defendant Jerry D. Cash joined QRC as Chairman of the Board and co-Chief Executive Officer in 2002, when he sold the natural gas-related assets of his company, STP Cherokee, Inc. ("STP Cherokee"), to QRC. (Cons. Compl., ¶ 39.) In 2004, Cash became QRC's sole CEO. (*Id.*)

After joining QRC in 2002, Cash continued to engage in outside businesses. (*Id.*) His company, STP Newco, retained STP Cherokee's oil-related assets and, in 2004, Cash formed Rockport Energy, LLC ("Rockport"), an oil and gas production company. (*Id.*, ¶¶ 39-40.)

Defendant David E. Grose was handpicked by Cash to serve as QRC's Chief Financial Officer. (*Id.*, ¶¶ 22, 40.) Grose joined QRC in 2004, at or about the same time that Cash formed Rockport. (*Id.*, ¶ 40.) Cash and Grose conspired and colluded to perpetrate the criminal fraud that underlies this matter. *See SEC v. Cash et al.*, Civil Action No. 5:09-cv-639-L (W.D. Okla.); *U.S. v. Grose*, Case No. CR 09-191 HE (W.D. Okla.); *U.S. v. Cash*, Case No. 5:09-cr-00241-D (W.D. Okla.).

Defendant Murrell Hall served as Quest's independent registered public accounting firm from on or before 2004, through August 1, 2008. (Cons. Compl., ¶ 26.)

3

For QELP's IPO in 2007, Murrell Hall audited the financial statements for the Cherokee Basin operations as of and for the years ended December 31, 2004, 2005, and 2006, and for the period from January 1, 2007, through November 14, 2007, that were "carved out" of the previous financial statements of QRC and used in QELP's IPO, and later audited QELP's financial statements as of December 31, 2007, and for the stub period of November 15, 2007, through December 31, 2007. (Cons. Compl., ¶¶ 83, 102.) Murrell Hall also reviewed QELP's first quarter 2008 financial statements.

Defendant Eide Bailly replaced Murrell Hall on August 1, 2008, and served as the independent registered public accounting firm for QRC and QELP until October 2008, during which it reviewed QELP's financial statements for the quarter ended June 30, 2008. (Cons. Compl., ¶ 27; Exs. D, Form 8-K, filed on Jan. 2, 2009, at 4.) Plaintiffs' conclusory allegation that Eide Bailly is the "successor entity" to Murrell Hall is the sole allegation against Eide Bailly.[2] (*Id.*, ¶¶ 26-27.)

**The Scheme**

Defendant Cash was "chronically cash-strapped." (Cons. Compl, ¶ 42, *citing* Amend. Compl., in *SEC v. Cash et al.*, Civil Action No. 5:09-cv-639-L (W.D. Okla.) ("SEC Compl."), ¶ 15.) He personally funded Rockport and other outside business ventures, and maintained a prodigious lifestyle, including spending millions to improve, decorate, and landscape his Oklahoma City mansion. (*Id.*, ¶¶ 40, 46.) He also purchased

---

[2] The Consolidated Complaint also names as defendants Quest Energy GP, LLC (a wholly owned subsidiary of QRC and QELP's general partner), and directors David C. Lawler, Gary Pittman, and Mark Stansberry. (Cons. Compl., ¶¶ 20, 23-25.)

luxury cars for himself, his family, and his gardener, and racked up at least $1.4 million in credit card debt. (*Id.*, ¶ 46.)

In 2004, Cash turned to Quest for illicit short-term financing. (*Id.*, ¶¶ 42-43.) Grose was complicit in the scheme and, in 2004 and 2005, initiated wire transfers from Quest to a secret bank account in Rockport's name, which Cash or Rockport repaid by year-end 2005. (*Id.*, ¶¶ 43-47; West Decl., Ex. G, SEC Compl., ¶¶ 17, 19.)

The transfers to Rockport resumed in 2006, but Cash and Rockport could no longer repay them. (Cons. Compl., ¶¶ 48-50.) To conceal this, in early 2006, Cash and Grose began "check kiting." (Cons. Compl., ¶¶ 49-54.) At the end of each succeeding quarter, despite insufficient funds, Rockport issued a check to Quest in the amount of the transfers. (*Id.*, ¶ 50-52.) Quest deposited the check, crediting the phantom funds against amounts due from Rockport. (*Id.*, ¶ 54.) On the first business day of the next quarter, Grose wired funds from Quest to Rockport to cover the check. (*Id.*, ¶ 52.) By carefully timing the transactions, Cash and Grose exploited the "float time" between banks, artificially inflating Quest's cash account to conceal their embezzlement. (*Id.*, ¶ 49-54; West Decl., Ex. G, SEC Compl., ¶ 2.)

By the end of 2006, the transfers to Rockport totaled $8 million. (Cons. Compl., ¶ 52.) By year-end 2007, Quest was out $10 million.[3] (*Id.*) In addition, Grose cut himself in on the action, conspiring with Quest's purchasing manager to embezzle

---

[3] As QELP points out, however, QRC and another Quest entity fully repaid QELP for the embezzled $10 million. (*See* Doc. No. 161, at 7-8 & Ex. 7.)

$850,000 from Quest in an illegal kickback scheme and taking an additional $1 million from Quest for a personal investment. (*Id.*, ¶¶ 55-57.)

**Cash and Grose Lie to the Auditors**

In March 2006, during its field work for Quest's 2005 audit, Murrell Hall questioned the Quest/Rockport transfers made, and repaid, in 2005. (*Id.*, ¶ 61.) Grose responded by explaining to the auditors that Quest used Rockport as a front to "scout" oil and gas leases for Quest. (*Id.*, ¶ 61; *see also* West Decl., Ex. G, SEC Compl., ¶ 26.)

In March 2008, Murrell Hall inquired about Quest/Rockport transfers a second time, in conjunction with Murrell Hall's field work for the 2007 audit. (*Id.*, ¶ 62.) This inquiry apparently concerned transfers made in 2007, although the Consolidated Complaint is unclear on this point. (*Id.*) Gross reiterated that Rockport was acting as an "undisclosed agent" for Quest. (*Id.*) He told the auditors that Quest's Board had approved the transfers, that Rockport held the money in an escrow account, and that he had a copy of the escrow statement. (*Id.*)

Indeed, for each audit from 2004 forward, Cash and Grose provided the auditors with a management representation letter, pursuant to which they certified that they had disclosed all related party transactions to the auditors, and that management had not engaged in any fraud.[4] (West Decl., Ex. G, SEC Compl. ¶¶ 4, 27.) In addition, Cash and

---

[4] A company's management typically provides such a letter in conjunction with an audit, the purpose of which is for management to confirm "critical representations" made to the auditors during the course of the audit. *In re Fitzhenry*, 162 P.3d 260, 266 (Or. 2007). That Cash and Grose provided Murrell Hall with such assurances is conspicuously absent from the Consolidated Complaint.

Grose falsely certified the effectiveness of QELP's internal controls and the accuracy of its financial reports in multiple filings with the SEC, a felony under federal law.[5] (Cons. Compl., ¶¶ 74, 94-95, 100-01, 106-07; 116-17; *see, e.g.,* West Decl., Ex. A, Form 10-K, filed with the SEC on March 31, 2008.)

**The Scheme is Exposed**

In July 2008, another officer of Quest discovered the transfers and alerted Quest's then-Chief Operating Officer, defendant David C. Lawler. (*Id.,* ¶ 65-66.) Cash told Lawler that Rockport was acting as a scout for Quest, and assured Lawler that the money would be paid back. (*Id.,* ¶ 66.) On August 11, 2008, Rockport issued Quest a check for $10 million, purportedly to repay the transfers. (*Id.,* ¶ 68.) The check bounced. (*Id.,* ¶ 68.) On August 22, 2008, Cash confessed to the scheme and, the following day, he resigned. (*Id.,* ¶ 69.)

The Board retained special counsel to investigate the matter. (*Id.*) During the investigation that followed, Grose provided special counsel with copies of minutes of Board meetings, purportedly signed by Cash and authorizing the arrangement with Rockport. (*Id.,* ¶ 70.) The minutes were fabricated. (*Id.,* ¶ 71.) Grose was placed on administrative leave, and later fired. (*Id.,* ¶ 121.)

On August 25, 2008, QELP announced the discovery of approximately $10 million in questionable transfers from Quest to Rockport, and that Cash had resigned.

---

[5] *See* Sarbanes-Oxley Act of 2002, ¶¶ 302, 17 C.F.R. § 240.13a-14 and 906, 18 U.S.C. § 1350 (providing substantial criminal penalties for willful violations).

(Cons. Compl., ¶ 10.)[6]  Several months later, on January 2, 2009, QELP announced that the audited financial statements for QELP, including the carve-out statements from 2005 through 2007, should no longer be relied upon. (*Id*, ¶ 2.)

On June 17, 2009, the SEC sued Cash and Grose for, among other things, deceiving the auditors in violation of Rule 13b2-2 of the Securities Exchange Act of 1934.[7]  (West Decl., Ex. G, SEC Compl., ¶¶ 26, 27, 66-68.)  17 C.F.R. § 240.13b2-2.  In addition, both men have been charged with felonies.  *See U.S. v. Grose*, Case No. CR 09-191 HE (W.D. Okla.); *U.S. v. Cash*, Case No. 5:09-cr-00241-D (W.D. Okla.).

**Plaintiffs' Allegations Against the Auditors**

Plaintiffs do not claim that Murrell Hall knowingly aided the fraud or knowingly allowed it to continue.   Rather, the Consolidated Complaint is rife with conclusory allegations that Murrell Hall did not do enough to uncover the fraud.  (Cons. Compl., ¶¶ 2, 8, 60, 63.)

Plaintiffs broadly allege that Murrell Hall disregarded "red flags" that should have alerted it to the scheme.  (*Id.*, ¶ 58.)  The only supposed "red flags" identified by plaintiffs, however, are the scheme itself and a "repayment" check for $10 million that Rockport bounced in April 2008.  (*Id.*, ¶¶ 53, 58-59, 64.)  Furthermore, plaintiffs allege

---

[6] This announcement was evidently made on Monday, August 25, 2008, and not Sunday, August 24, 2008, as alleged in the Consolidated Complaint. (West Decl., Ex. C, Form 8-K, filed Aug. 25, 2008, at att. press release.)

[7] Rule 13b2-2 governs management's conduct in connection with financial reporting, and prohibits an officer or director from making any materially false or misleading statement to an accountant in connection with an audit, review or examination of the company's financial statements or the preparation or filing of any document required by the SEC.

that the scheme was the product of collusion involving Quest's top executives and exceedingly difficult to detect, and that Cash and Grose told the auditors "elaborate" lies to cover their tracks. (*Id.*, ¶¶ 3-6, 8.) As to the bounced check, plaintiffs do not allege that Murrell Hall was even aware of it. On the contrary, they allege that Cash resolved the issue with the banks. (*Id.*, ¶ 53.)

Plaintiffs also resort to "group pleading" in an attempt to bolster their claims against the accountants. (*Id.*, ¶¶ 9, 16, 35, 37, 97, 100, 103, 108, 112, 118, 147, 169-71, 178-80, 206-14.) For example, plaintiffs repeatedly allege that all defendants misrepresented the effectiveness of Quest's internal controls. (*Id.*, ¶¶ 97, 100, 103, 108, 112, 118.) This tactic is particularly egregious, as plaintiffs acknowledge in allegations elsewhere in their pleadings that Murrell Hall did not audit Quest's internal controls and that Murrell Hall expressly disclaimed any opinion as to the effectiveness of such controls. (*Id.*, ¶¶ 88, 102.)

Ultimately, plaintiffs' purported securities fraud claim against the accountants rests entirely upon allegations that Murrell Hall made accounting errors, violated SEC rules, and did not conduct its audits in accordance with generally accepted auditing standards. (*Id.*, ¶¶ 122-23, 127, 134-68.) All of those allegations are conclusory in nature and, at best, suggest no more than auditor negligence.

9

## ARGUMENT[8]

In this putative class action under Section 10(b) and Rule 10b-5, plaintiffs are required to plead and prove: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission, which is referred to in cases involving public securities markets as "transaction causation"; (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the misrepresentation and the loss. *Stoneridge Inv. Partners, LLC v. Scientific-Atlantic, Inc.*, 552 U.S. 148, 157 (2008); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005). Liability under Section 10(b) does not extend to aiders and abettors. *Stoneridge*, 552 U.S. at 157-58. Thus, for the accountants to be held liable, their conduct "must satisfy each of the elements or preconditions for [primary] liability under Section 10(b)." *Id.* at 158.

## I.    APPLICABLE STANDARD.

Though a court faced with a Rule 12(b)(6) motion to dismiss must construe all factual allegations in the light most favorable to the non-moving party, a complaint that contains "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not do. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1940 (2009), *citing Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a complaint cannot simply leave "open the possibility that a plaintiff might later

---

[8] Certain arguments and authorities set forth in the memoranda submitted to the court by co-defendants QELP, Quest Energy, Pittman, Stansberry, and Lawler in support of their motions to dismiss apply equally to the defendant accountants. (*See* Doc. Nos. 159-61.) Rather than burdening the court with duplicative arguments, the accountants incorporate the arguments by reference.

establish some 'set of [undisclosed] facts' to support recovery." *Twombly*, 550 U.S. at 561-62 (citation omitted). Instead, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (citation omitted).

This action alleging securities fraud is also governed by Rule 9(b) of the Federal Rules of Civil Procedure and the Public Securities Litigation Reform Act of 1995 ("PSLRA"), both of which impose exacting pleading standards on plaintiffs to curb abusive litigation. *Tellabs*, 551 U.S. at 313, 319-20. "The interplay between Rule 12(b)(6)...and the PSLRA is important." *Cal. Pub. Employees' Retirement Sys. v. Chubb Corp.*, 394 F.3d 126, 145 (3rd Cir. 2004). "[U]nless plaintiffs in securities fraud actions allege facts supporting their contentions of fraud with the requisite particularity mandated by [the PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations – inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." *Id.* Thus, to survive this motion to dismiss, plaintiffs must do more than state a facially plausible claim against the accountants. The PSLRA requires plaintiffs to "state with particularity both the facts constituting the alleged violation, and facts ... giving rise to a strong inference that [the accountants] acted with the required state of mind." *Id.* at 313-14; *see* 15 U.S.C. § 78u-4(b)(2); Fed. R. Civ. P. 9(b).

As set forth in the following sections of this memorandum, the Consolidated Complaint against the accountants fails to satisfy the *Iqbal* standard, and does not comply with the stringent pleading standards imposed by Rule 9(b) and the PSLRA. Accordingly, the claims against them should be dismissed.

## II. PLAINTIFFS FAIL TO STATE A CLAIM AGAINST THE ACCOUNTANTS UPON WHICH RELIEF CAN BE GRANTED.

### A. Plaintiffs Fail to Allege Facts That Give Rise to Strong Inference of Scienter.

The PSLRA requires that, for each act or omission alleged to have violated Section 10(b) and Rule 10b-5, plaintiffs shall "state with particularity the facts giving rise to a strong inference that [the accountants] acted with the required state of mind. 15 U.S.C. § 78u-4(b)(2). "Complaints that do not adequately allege scienter are to be dismissed." *Public Employees' Retirement Assoc. of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 312 (4th Cir. 2009), *citing* 15 U.S.C. § 78u-4(b)(3)(A).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," and involves conduct that is either deliberately illegal or reckless. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1258-59 (10th Cir. 2001) (citation omitted), *citing Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n.12 (1976). "Recklessness is ....'akin to conscious disregard.'" *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1289 (N.D. Okla. 2007), *citing In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 550 (6th Cir. 1999). For an independent auditor, "recklessness … entails a mental state so culpable that it approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company." *Id.* (citation omitted).

12

In *Tellabs*, the Supreme Court prescribed the analysis necessary to determine whether a plaintiff has adequately alleged scienter. 551 U.S. at 322-23. First, as noted above in part I, the court must accept all well-pleaded allegations in the complaint as true. *Id.* at 322. Second, as noted above in footnote 1, the court must consider the complaint in its entirety, as well as documents referred to therein and matters of public record, to determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter...." *Id.* (emphasis in original). Finally, "the court must take into account plausible opposing inferences" but the inference of scienter "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 323. "A complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

"[Recklessness is] highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re Williams*, 496 F. Supp. 2d at 1289 (citation omitted).

In this case, plaintiffs do not allege facts to support any inference, must less a strong inference, that Murrell Hall knew the true nature of the transfers, or engaged in any conduct approximating an actual intent to aid Cash and Grose in carrying out their fraudulent scheme. Accordingly, the Consolidated Complaint against the accountants should be dismissed.

### 1.    The group pleading doctrine does not apply to the accountants.

Plaintiffs impermissibly attempt to attribute a wide range of conduct to Murrell Hall and Eide Bailly by conflating all defendants into one. (*See, e.g.*, Cons. Compl., ¶¶ 9, 16, 35, 37, 97, 100, 103, 108, 112, 118, 147, 169-71, 178-80, 206-14.)  That attempt amounts to nothing more than a misapplication of the group pleading doctrine.

The Ninth Circuit established the group pleading doctrine in 1987.  *See Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987), *superseded by statute as stated in In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984-85 (S.D. Ohio 2008). When the Tenth Circuit subsequently adopted the doctrine, it explained the doctrine as follows:  "Identifying the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group published documents such as annual reports, which presumably involve collective actions of corporate directors or officers." *Schwartz v. Celestial Seasonings*, 124 F.3d 1246, 1254 (10th Cir. 1997).

"[W]hether the group pleading doctrine is still viable after the PSLRA's enactment is currently a matter of debate," but one federal court in Oklahoma has held that the doctrine survives. *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1242, 1259-60 (N.D. Okla. 2003).  Even so, a plaintiff may not invoke it unless "the plaintiff has alleged facts indicating that the defendant was <u>a corporate insider or affiliate with direct involvement in the daily affairs of the company</u>." *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 479 (S.D.N.Y. 2006) (emphasis added; citation omitted).

Because plaintiffs do not allege that the accountants were corporate insiders who had direct involvement in Quest's daily affairs, grouping them with the other defendants

is manifestly inconsistent with the group pleading doctrine. Moreover, without the benefit of that doctrine, plaintiffs' collective allegations against all defendants cannot satisfy the rigorous pleading standards imposed by Rule 9(b) and the PSLRA. *See, e.g.*, *Lillard v. Stockton*, 267 F. Supp. 2d 1081, 1102-07 (N.D. Okla. 2003) (granting motion to dismiss where plaintiff's conclusory allegations "fail[ed] to satisfy the heightened pleading requirement of particularity under Rule 9(b) and the PSLRA"); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 984-85 (S.D. Ohio 2008) ("The PSLRA requires plaintiffs to distinguish among those whom they sue and enlighten each defendant as to his or her particular part in the alleged fraud."). Thus, any blanket allegations that purport to include the accountants must be disregarded. *Chubb*, 394 F.3d at 145.

### 2.    Quest's top executives conspired to deceive the auditors.

"[T]o establish a strong inference of scienter, plaintiffs must do more than merely demonstrate that [Murrell Hall] should or could have done more." *Deloitte & Touche*, 551 F.3d at 314; *DSAM Global Value Fund v. Altrist Software*, 288 F.3d 385, 390 (9th Cir. 2002) (rejecting the notion that an alleged failure to investigate gives rise to a strong inference of scienter). Indeed, to establish the necessary inference, plaintiffs must plead and prove that the auditors "were either knowingly complicit in the fraud, or so reckless in their duties as to be oblivious to the malfeasance that was readily apparent." *Deloitte & Touche*, 551 F.3d at 314. Plaintiffs cannot do that in this case.

As set forth above in the "Facts" section of this memorandum, plaintiffs' conclusory allegations of purported "red flags" are "not based on specific facts that shed [any] light" on auditors' mental state. *DSAM Global*, 288 F.3d at 390-91. (*See* Facts,

*supra* at 7-8.)    Cash and Grose conspired to deprive the accountants of accurate information regarding QELP's finances. (*Id.*, at 5-6 and 7-8.) They lied to the auditors, falsely certified financial statements, and fabricated board approval for the arrangement with Rockport.[9] (*Id.*)

Plaintiffs do not allege that the auditors knew the true nature of the Quest/Rockport transfers, or that the use of a front or a straw man to negotiate oil and gas leases was so irregular that Murrell Hall should have readily concluded that the stated reason for the Quest/Rockport transfers was false. As in *Deloitte & Touche*, the fact remains that the fraudulent scheme went undetected because Quest's top management colluded to deceive the auditors. 551 F.3d at 315. The most plausible inference that one can draw from this is that the auditors were not involved in the fraud. *Id.* at 314 (noting that, although the auditors' failure to demand more evidence may have been improper under professional standards, that is not the benchmark for stating a claim of securities fraud, "which 'requires more than a misapplication of accounting principles'") (citation omitted).

In addition, contrary to plaintiffs' blanket assertion that all defendants misrepresented the effectiveness of Quest's internal controls, (Cons. Compl., ¶¶ 97, 100, 103, 108, 112, 118), it is management's responsibility to establish and maintain "an adequate internal control structure and procedures for financial reporting." Sarbanes-

---

[9] "Because of the characteristics of fraud, even a properly planned and performed audit may not detect a material misstatement …. [c]ollusion [among management] may cause the auditor who has properly performed the audit to conclude that evidence provided is persuasive when it is, in fact, false." U.S. Auditing Standards, AU § 230.12.

Oxley Act of 2002, § 404, 15 U.S.C. § 7262. Moreover, as plaintiffs themselves acknowledge, Murrell Hall's opinion letters appropriately disclaimed (i) any audit of QELP's internal controls and (ii) any opinion concerning the effectiveness of those controls. (*See, e.g.*, Cons. Compl., ¶¶ 88, 102.) Even without those disclaimers, however, plaintiffs cannot establish the requisite "strong inference" of scienter by merely alleging that the accountants failed to do enough to unmask the fraud perpetrated by Cash and Grose. *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 120-21 (2d Cir. 1982) (holding that auditors' alleged failure to identify problems in a company's internal control and accounting practices was not sufficient to give rise to a strong inference of scienter). Simply put, Murrell Hall's failure to detect the lies and collusion of its client's CEO and CFO is not remotely akin to fraudulent intent.

### 3.    It is well settled that alleged violations of professional standards do not give rise to a strong inference of scienter.

Plaintiffs' litany of alleged accounting errors is similarly unavailing. Plaintiffs have not alleged any link between the alleged errors and the fraudulent scheme. Further, it is well settled that alleged violations of generally accepted auditing standards ("GAAS") or generally accepted accounting principles ("GAAP") do not give rise to a "strong inference" of knowing or reckless conduct. *See City of Philadelphia*, 264 F.3d at 1261 ("[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim."); *Ezra Charitable Trust v. Tyco Int'l Ltd.*, 466 F.3d 1, 12, n.10 (1st Cir. 2006) ("Alleging a poor audit is not equivalent to alleging an intent to deceive."); *Chill v. General Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996); *Ley*

17

*v. Visteon Corp.*, 543 F.3d 801, 816 (6th Cir. 2006) ("Allowing an inference of scienter based on the magnitude of the fraud would eviscerate the principle that accounting errors alone cannot justify a finding of scienter."); *In re Comshare*, 183 F.3d at 553; *Ferris, Baker Watts, Inc. v. Ernst & Young, LLP*, 395 F.3d 851, 855 (8th Cir. 2005) (holding that, even assuming GAAP and GAAS violations occurred, the plaintiff's "catch-all and blanket assertions" that the auditors acted knowingly or recklessly are not "evidence of corresponding fraudulent intent"); *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x 702, 710 (10th Cir. 2006); *Keeney v. Larkin*, 306 F. Supp. 2d 522, 541 (D. Md. 2003). In *DSAM Global*, even allegations of a "seriously botched audit" were inadequate to state a securities fraud claim. 288 F.3d at 387.

Likewise, that successor auditors restated QELP's financial reports does not support a strong inference of reckless conduct, particularly in this case, where the restatements had both positive and negative effects or were so clearly immaterial.[10] (Cons. Compl., ¶¶ 127, 130, 133.) *See Fidel v. Farley*, 392 F.3d 220, 231 (6th Cir. 2004) (noting that "'[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud'") (*citing In re Comshare*, 183 F.3d at 553 *and Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir.1999)), *overruled on other grounds by Tellabs*, 550 U.S. 308; *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265-66 (11th Cir. 2006). In any event, plaintiffs do not contend that any of

---

[10] For example, the effect of the restatement for 2006 (the last full year prior to the IPO) was to *increase* QELP's net income by $76.5 million (from negative $47.5 million to $29 million). *See* West Decl., Ex. F, Form 10-K, filed with the SEC on June 16, 2009, at 5-6.

the restated account balances were related to the fraud by Cash and Grose, with the lone exception of the account balance for cash. (Cons. Compl., ¶¶ 130, 133.)

Plaintiffs' allegations state a claim for negligence, at most. Such a claim falls far short of what is necessary to allege scienter. *See DSAM Global*, 288 F.3d at 391 (holding that "[n]egligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud under the PSLRA"); *Ezra*, 466 F.3d at 12 & n.10 ("Even if one deemed [the auditor's] failure to discover the problem negligent, or perhaps inexcusably negligent, that is well short of the conscious misconduct or extreme recklessness necessary to allege scienter.").

**B.    Plaintiffs Fail to Adequately Plead Loss Causation.**

Section 10(b) and Rule 10b-5 serve "to maintain public confidence in the marketplace," and "not to provide investors with broad insurance against market losses." *Dura*, 544 U.S. at 345. Accordingly, an investor seeking to recover under those federal securities laws is required to plead and prove "loss causation" -- *i.e.*, a causal connection between a specific material misrepresentation and the investor's claimed economic loss. *Id.* at 342-46. Plaintiffs fail to adequately plead loss causation in the present case.

Plaintiffs broadly allege that material misstatements and omissions in QELP's financial reports artificially inflated the price of QELP's common shares and that, "[a]s a direct and proximate result..., Plaintiffs...suffered damages in connection with their respective purchase and sales of [QELP's] securities during the Class Period." (Cons. Compl., ¶ 214.) That broad allegation is not sufficient to allege loss causation, even assuming that QELP units traded in an efficient public market.

19

In *Dura*, the Supreme Court established that a plaintiff cannot adequately plead loss causation by merely asserting that artificially inflated stock prices alone caused an economic loss. 544 U.S. at 342-46. Instead, the plaintiff must first plead that "the truth became known" before the artificially inflated price dropped. *Id.* at 344-45. In addition, consistent with the PSLRA, the plaintiff must specifically identify the substance of the disclosure that allegedly caused the price to decline and must tie that disclosure to the decline in price. *Id.* at 345-46. In the present case, plaintiffs particularly fail to convincingly tie any disclosure to any decline in share price.

Plaintiffs allege that, on August 25, 2008, when QELP disclosed the "questionable transfers," the price of QELP common shares fell $3.22 per share or nearly 23% to $11.49, thus "eliminating" the artificial inflation in price.[11]  (Cons. Compl., ¶ 172.) Plaintiffs follow this with conclusory allegations that the market continued to decline as the investing public "absorbed" the negative news. (*Id.*, ¶ 173.) This tactic does not satisfy *Dura's* mandate. Moreover, plaintiffs' conclusory allegations about the market for the shares are belied by what public records showed actually occurred.

For example, the price of QELP common shares went up on August 26 and 27, 2008. (West Decl., ¶ 10.) Furthermore, on January 2, 2009, when Quest announced that QELP's financial reports could no longer be relied upon, the price of QELP common shares closed the day up 34.9%, or $.76 per share. (*Id.*, ¶ 10 & Ex. D, Form 8-K, filed with the SEC on Jan. 2, 2009.) Similarly, on June 16, 2009, when QELP actually issued

---

[11] Records of historical closing prices actually show that, on August 25, 2008, the price of QELP's common shares closed down $2.68 per share (19%), and not $3.22 per share, as plaintiffs contend. (West Decl., ¶ 10.)

the restatements, the price for QELP units again moved up, albeit only slightly. (*Id.*, ¶ 10 & Ex. F, Form 10-K, filed with the SEC on June 16, 2009.) Thus, far from causing the price of the common shares to decline, the news of the restatements and the restatements themselves (which plaintiffs allege were "staggering in…sheer number and scope") actually led to *increases* in the price of QELP common shares. (Cons. Compl., ¶ 127.)

Nor can plaintiffs establish loss causation by pointing to the price drop that occurred on January 28, 2009, when QELP announced that it had decided to suspend distributions of QELP units. (*Id.*, ¶ 174.) Plaintiffs contend that that price drop -- in the amount of $1.97 or 48% -- was caused by the disclosure of alleged material misstatements or omissions, and not by "general market conditions or other factors." (*Id.*, ¶ 175.) But QELP's press release from that day contradicts plaintiffs' allegation and reflects the true reason for the decline in share price. (West Decl., Ex. E, Form 8-K, filed with the SEC on Jan. 28, 2009, at att. press release.) That press release attributes the decision to suspend distributions (*i.e.*, dividends) to a desire to ensure that QELP had "sufficient liquidity … in light of the recent declines in natural gas prices." (*Id.*) In other words, the press release expressly refers to the very sort of "general market conditions or other factors" that plaintiffs contend had nothing to do with the price drop. Moreover, the very fact that the press release announced a suspension of dividends to shareholders provides a decidedly more plausible reason for the corresponding decline in the share price than do plaintiffs' vague allegations about the impact of the announcements that were made in late-August 2008 and early-January of 2009.

Finally, QELP's discussion in its Form 10-K regarding economic conditions that existed at and after late-August 2008 makes clear that a "tangle of factors" affected and continue to affect the price of QELP's common shares:

> At about the same time as the Transfers were discovered, the global economy experienced a significant downturn. The crisis began over concerns related to the U.S. financial system and quickly grew to impact a wide range of industries. There were two significant ramifications to the exploration and production industry as the economy continued to deteriorate. The first was that capital markets essentially froze. Equity, debt and credit markets shut down. Future growth opportunities have been and are expected to continue to be constrained by the lack of access to liquidity in the financial markets.
>
> The second impact to the industry was that fear of global recession resulted in a significant decline in oil and gas prices.... Our operations and financial condition are significantly impacted by these prices.... Overall, as a result, our operating profitability was seriously adversely affected during the second half of 2008 and is expected to continue to be impaired ....

(West Decl., Ex. F, Form 10-K, filed with the SEC on June 16, 2009, at 12.) *Dura*, 544 U.S. at 345; *Decker*, 681 F.2d at 114 (noting that strike suits "flourish" in such an economic climate). Indeed, the substantial decline in the price of QELP common shares from August 2008 to January 2009 is consistent with the performance of other oil and gas securities during that time frame. (*Id.*, Ex. H.) Thus, plaintiffs' simplistic reliance on the mere fact that the price of QELP's common shares declined over time beginning in late-August of 2008 is not sufficient to allege loss causation.

### C.    Plaintiffs Otherwise Fail to State a Claim Against Eide Bailly.

#### 1.    Plaintiffs Do Not Attribute Any Material Misstatement or Omission to Eide Bailly.

To plead a claim for securities fraud, the PSLRA requires plaintiffs to "specify each statement or omission alleged to have been misleading [and] the reason or reasons

why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Plaintiffs must do more than allege that statements are materially misleading: "they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

Plaintiffs do not attribute any statement or omission to Eide Bailly. Further, even if plaintiffs amend their complaint to recognize that Eide Bailly, and not Murrell Hall, served as QELP's independent registered public accounting firm with respect to the second quarter 2008 Form 10-Q, such an amendment would be futile. (Cons. Compl., ¶ 115; *see* West Decl., Ex. D, Form 8-K, filed with the SEC on Jan. 2, 2009, at 4.) As noted above, plaintiffs have not adequately alleged scienter with respect to Murrell Hall or Eide Bailly. Regardless, the Form 10-Q contained only unaudited financial statements. (Cons. Compl., ¶¶ 114-18; *see* West Decl., Ex. B, Form 10-Q, filed Aug. 12, 2008, at 4.) Thus, Eide Bailly did not express any opinions regarding the financial statements. Moreover, whether Eide Bailly signed-off on or approved the inclusion of unaudited financial information contained in the Form 10-Q is irrelevant, because the Form 10-Q did not attribute any statements to Eide Bailly. Absent any such attributions, Eide Bailly cannot be found to have made any false or misleading statements on which investors relied. *See, e.g., Wright v. Ernst & Young LLP*, 152 F.3d 169, 173-76 (2d Cir. 1998) (dismissing securities fraud complaint against accounting firm because no statements or assurances of any kind were attributed to it).

2.    **Plaintiffs Fail to State a Plausible Claim for Successor Liability Against Eide Bailly.**

Plaintiffs evidently seek to hold Eide Bailly liable for securities fraud based on bald assertions that Eide Bailly "acquired" Murrell Hall's operations, and "certain of its professional staff and shareholders." (Cons. Compl., ¶¶ 26-27.) These alleged facts, even if true, are insufficient to state a claim of successor liability.

As a general rule, when one company sells its assets to another, the buyer is not liable for the seller's debts and liabilities unless: 1) the buyer agreed to assume such debts and liabilities; 2) the companies consolidated or merged; 3) the transaction was fraudulent; or 4) the buyer is a mere continuation of the seller. *See, e.g., Crutchfield v. Maine Power Engine Co.*, 209 P.3d 295, 297 (Okla. 2009); *see also Crowley v. VisionMaker, LLC*, 512 F. Supp. 2d 144, n.4 (S.D.N.Y. 2007); *Forrest v. Beloit Corp.*, No. CIV. A. 00-CV-5032, 2001 WL 1251460, at *2 (E.D. Pa. Sep. 21, 2001); *Nova Molecular Techs., Inc. v. Penn Specialty Chems., Inc.*, No. 08-2039-STA, 2009 WL 564433, at *3-5 (W.D. Tenn. Mar. 5, 2009).

The Consolidated Complaint does not contain factual allegations to support any exception to the general rule that Eide Bailly is not liable for Murrell Hall's debts and liabilities. As *Iqbal* stresses, it is not enough for plaintiffs to plead facts that are merely consistent with liability. 129 S. Ct. at 1949. Plaintiffs fail to state a claim of successor liability against Eide Bailly that is plausible on its face. *See, e.g., Crowley*, 512 F. Supp. 2d at n.4 (rejecting conclusory allegation that one company is "successor in interest" to another as inadequate to state a claim of successor liability under New York law);

*Forrest*, No. CIV. A. 00-CV-5032, 2001 WL 1251460, at *2-3 (dismissing complaint against defendant on grounds that allegation that defendant had "acquired" another corporation was inadequate under Pennsylvania law for successor liability claim to go forward); *Nova Molecular*, No. 08-2039-STA, 2009 WL 564433, at *4 (concluding that bare allegation that defendant acquired the assets of another company is inadequate to state a claim for successor liability under Tennessee law).

## III.    PLAINTIFFS SHOULD BE DENIED ANY REQUEST TO REPLEAD.

As plaintiffs aver in the Consolidated Complaint, they have thoroughly investigated this matter. (Cons. Compl., ¶ 1.) Nevertheless, plaintiffs are unable to state a claim of securities fraud against the accountants. Any request by plaintiffs for leave to amend the Consolidated Complaint should be denied as futile.

## CONCLUSION

For the foregoing reasons, plaintiffs fail to state a claim against the accountants upon which relief can be granted. The Consolidated Complaint against Murrell Hall and Eide Bailly should be dismissed, with prejudice.

MOSS & BARNETT
A Professional Association

Dated: January 4, 2010

By s/ Terese A. West
Thomas J. Shroyer
Peter A. Koller
Terese A. West
4800 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-4129
Telephone: (612) 877-5407
Facsimile: (612) 877-5999
Email: ShroyerT@moss-barnett.com
Email: KollerP@moss-barnett.com
Email: West@moss-barnett.com

Thomas G Wolfe, OBA No. 11576
Jason M. Kreth, OBA No. 21260
PHILLIPS MURRAH PC
101 N Robinson Ave, 13 Floor
Oklahoma City , OK 73102
Telephone: 405-235-4100
Facsimile: 405-235-4133
Email: ecf@phillipsmurrah.com
Email: jmkreth@phillipsmurrah.com

*ATTORNEYS FOR MURRELL, HALL,
MCINTOSH & CO., PLLP, AND
EIDE BAILLY LLP*

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of January, 2010, I electronically transmitted

the foregoing to the Clerk of the Court using the ECF system for filing. Based on the

records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing

to all interested parties.

s/ Terese A. West

1528727v3

26